924 P.2d 702 (1996)
SHERIFF, WASHOE COUNTY, Nevada, Appellant,
v.
Robert Lee FULLERTON and Corinne F. Bennett, Respondents.
No. 24489.
Supreme Court of Nevada.
August 28, 1996.
Frankie Sue Del Papa, Attorney General, and Grenville Thomas Pridham, Deputy Attorney General, Carson City, for Appellant.
C. Frederick Pinkerton, Reno, for Respondents.
Joseph C. Long, Norman, Oklahoma, for Amicus Curiae North American Securities Administrators Association, Inc.

Opinion
ROSE, Justice:
This case revolves around a patented invention known as a "zip nut" and the efforts to exploit its obvious potential. More particularly, the issues on appeal relate to the efforts of respondent Robert Lee Fullerton ("Fullerton"), the inventor of the device to whom the patent was issued, and respondent Corinne F. Bennett ("Bennett"), to solicit investors for the production and marketing of *703 the zip nut. The respondents' efforts in this regard led to the formation of various corporations. The State of Nevada filed a civil complaint for securities fraud and the appointment of a receiver against respondents involving: (1) the selling of stock in one of these corporations, First Phoenix, Inc., without telling investors of the existence of other Fullerton-formed corporations claiming an interest in the patent; and (2) the failure to disclose that a federal injunction had been issued against respondents' activities regarding the patent. The district judge presiding over the civil receivership case determined that Fullerton was not guilty of fraud, but was simply a poor businessman, and entered consent orders restructuring the various corporate entities into one entity in which Fullerton and the investors were given various interests. Thereafter, but while the civil matter was still pending, criminal indictment proceedings were initiated against the respondents, alleging the same violations of Nevada's Uniform Securities Act that had been alleged in the civil case.
The order appealed from in the instant case granted the respondents' petitions for habeas corpus and motion to dismiss the criminal charges against them. The district court's rulings were based upon findings that: (1) the initiation of criminal proceedings following the filing of the still pending civil action had violated the respondents' rights against double jeopardy; (2) the State's use of the civil receiver in pursuing the criminal action deprived respondents of their rights to due process, as it gave the prosecutor access to evidence which would otherwise have been available only through a criminal investigation conducted under constitutional safeguards; and (3) the prosecutor engaged in misconduct and acted under a conflict of interest by working with the attorney who had represented respondents in the civil action, and whose financial interests were now adverse to his former clients, in preparing the criminal indictment.
For reasons discussed hereafter, we conclude that the respondents were not subjected to double jeopardy and that the district court incorrectly determined that respondents' due process rights were violated. We therefore reverse the orders entered below and remand to the district court for trial.

FACTS
A detailed exposition of factual background and the procedural history of the civil and criminal proceedings is essential to an understanding of the ratio decidendi of our disposition of this appeal.
In 1979 Fullerton applied for the protection of a patent on his invention denominated the "zip nut." The zip nut was designed for a quick and easy attachment to a bolt. In late 1982, prior to receiving the patent, Fullerton assigned his "entire right, title and interest" therein to Fullerton Zip Nut, Inc., a Utah corporation, and recorded this assignment with the U.S. Patent and Trademark Office in January of 1983. The patent on the zip nut was issued to Fullerton in March of 1983. Later, in February of 1985, Fullerton Zip Nut, Inc. was merged into Fullerton Inc., a Nevada corporation, with the intent of providing Fullerton Inc. with the patent rights to the zip nut held by Fullerton Zip Nut, Inc. Thereafter, for reasons which are not apparent on the record, Fullerton and Fullerton Inc. were sued by former shareholders of Fullerton Zip Nut, Inc. in Utah's federal district court. The latter court issued a preliminary injunction on April 8, 1988, enjoining Fullerton and Fullerton Inc. from dissolving Fullerton Inc. or from transferring any of the assets of Fullerton Inc., including patent rights.
In October 1988, Fullerton and Bennett formed First Phoenix, Inc., a Nevada corporation, with Bennett as president and Fullerton as secretary/treasurer. Respondents assert that First Phoenix had, as its only asset, a fifty percent interest in all profits Fullerton received from the zip nut product. As a further complication, in December of 1988, Fullerton assigned all rights in the zip nut patent to Crescent Products Corporation (a Virginia corporation, the stock of which was apparently owned by Fullerton) and recorded this assignment with the U.S. Patent and Trademark Office on January 9, 1989. Fullerton also dissolved Fullerton Inc. in December of 1988. All of these actions appeared to *704 be in violation of the federal injunction issued in Utah.
The State of Nevada alleges that between May 1989 and September 1990, Fullerton and Bennett sold stock in First Phoenix, Inc., although First Phoenix was not registered to sell securities in Nevada and Fullerton and Bennett were not licensed as sales representatives in Nevada. One of the investors who purchased stock, Greg McVickers, is alleged to have been hired by Bennett and Fullerton to solicit more investors despite the fact that McVickers was also unlicensed to sell securities.
The State alleges that the foregoing activities constituted fraudulent conduct on the part of Bennett and Fullerton, since McVickers and the other investors believed they were investing in the zip nut product (the company was referred to generically as the zip nut corporation, which in fact did not exist). In fact, however, First Phoenix, Inc. had no rights to the product because the rights had been assigned to other corporations. Moreover, the investors were not told of the federal lawsuit and injunction in Utah, and the securities were unregistered and the salesmen unlicensed. In addition, the investors were unaware that Bennett and Fullerton were allegedly living off the investors' funds and otherwise using the funds for personal and private benefit.
On May 16, 1991, Bennett and Fullerton incorporated Zip Nut, Inc., a Nevada corporation. Respondents refer to this as the "development stage corporation" of the zip nut device and, according to their brief and the testimony of their one-time attorney John Schell, this corporation was designed to be the shell corporation into which the interests of Fullerton, First Phoenix, and Crescent Products would be consolidated.

Procedural history of the civil action
On September 4, 1991, the State of Nevada, ex rel. the Secretary of State and Securities Division, filed a civil complaint against Fullerton (both individually and d/b/a Fullerton Design), Crescent Products Corporation d/b/a Fullerton Design, Zip Nut, Inc., and various Does, and later, Bennett.[1] The complaint alleged claims for relief based upon: (1) the offer and sale of unregistered securities, in violation of NRS 90.460; (2) unlawfully transacting business as a broker-dealer and unlawfully transacting business as a sales representative, in violation of NRS 90.310; and (3) fraud committed by Fullerton in the offer and sale of securities, in violation of NRS 90.570.
The complaint sought: injunctive relief against the respondents and the named corporations enjoining them and Fullerton's agents from transferring or dissipating the assets of the named corporations; the appointment of a temporary receiver who would assume control of the corporate assets (including, presumably, the patent rights), and the benefits received from respondents' activities; rescission of all agreements with the investors together with restitution of the investors' funds; and civil penalties of $2,500 for each instance of a securities act violation, together with costs and fees.
The parties stipulated to a temporary restraining order and the appointment of Matthew Callister, Esq. as receiver of all corporate and individual defendants' assets. Callister thereafter took possession of Fullerton and Bennett's personal papers, questioned them regarding their sources of income and expenditures, and took control of all personal and corporate bank accounts, requiring respondents to also give him monthly financial reports. According to statements made by the criminal prosecutor during oral arguments on the motion resulting in the present appeal, Callister informed the respondents one week after the filing of the civil complaint that a criminal investigation of their activities was pending.[2]
*705 On September 12, 1991, a hearing was held on the State's motion for a permanent injunction. Garrett Sutton and John Schell represented the defendants below. A complete transcript of this hearing is not available in the record, but according to the respondents' brief, the State's witnesses included a sheriff's deputy who had recorded a conversation with Fullerton, showing that Fullerton had sold First Phoenix stock without disclosing either the assignment to Crescent Products or the federal injunction.
According to the respondents' brief, John Schell testified on the defendants' behalf that he had advised Fullerton that sales of First Phoenix stock did not violate the Utah injunction, and that Fullerton was not required to apprise the First Phoenix investors of either the Utah injunction or the assignment to Crescent Products since neither posed a risk to the investors. Schell, who described himself as a commercial securities attorney, also testified that Fullerton held the patent rights, was the sole owner of Crescent Products, and would own the controlling interest in the newly formed Zip Nut, Inc., which Schell testified was the corporation into which Fullerton's assets, Crescent Products and First Phoenix would be placed  giving the First Phoenix investors "a share of a larger pie." Schell had enough confidence in the newly formed Zip Nut, Inc. to invest in the new corporation himself, after full disclosure of the Utah litigation and all assignments, and also testified that, while he would have structured the First Phoenix offering differently had he been acting as Fullerton's counsel at the time, he saw nothing illegal about it.
On September 17, 1991, District Judge Stone entered a preliminary injunction against the defendants, enjoining them from engaging in any further transactions in violation of Nevada's securities laws and ordered the appointment of Callister as receiver over all of the defendant corporations' assets. The court order noted that the federal action pending in Utah also involved the zip nut patent at issue here, and that Fullerton had acted "in blatant violation" of the federal court's order when he "dissolved his original corporation and created a new corporation from which he sold stock based upon his rights in the patent at issue."
On October 24, 1991, a hearing was held for the purpose of receiving a status report from Callister. At this hearing, the district court judge stated that he did not consider Fullerton to be a thief, but simply not a very good businessman and further indicated his intention to sign an order which, among other things, would "allow[] zip nut to go forward with the licensing, manufacture, [and] distribution" of the product, apparently under the operative control of investor/attorney John Schell. Thereafter, Judge Stone entered the promised "consent order" on October 24, 1991, requiring, among other things, a reorganization plan to be sent to all shareholders of First Phoenix which, according to appellant's opening brief, merged most of Fullerton's corporations into Zip Nut, Inc. and allowed all of the investors to become shareholders in the new corporation. The consent order also dismissed the complaint, without prejudice, against Zip Nut, Inc., and released Zip Nut, Inc. from the receivership.
A subsequent hearing was held on November 7, 1991, at which the judge reiterated that "I don't think Mr. Fullerton is a crook, I think he is a lousy businessman, but he has not intentionally tried to deprive anything of anybody [sic], and that's the bottom line here."
On November 12, 1991, a stipulation and settlement agreement was filed in the Utah action, which called for the reinstatement of Fullerton Inc. and the forfeiture and relinquishment by Fullerton of his stock in that entity, followed by the changing of the name of Fullerton Inc. to a name not implying any connection with Fullerton or the rights covered by the agreement. Appellant notes that the Utah settlement agreement did not cancel the assignment of patent rights to Fullerton Zip Nut, Inc., which Fullerton had recorded on January 13, 1983. Thus, it is not entirely clear how the resolution of the Utah matter would affect the rights of the Nevada litigants. In any event, its eventual dismissal seems to have indicated that Zip Nut, Inc. *706 could go forward with its marketing of the product, as in the words of Callister, in his grand jury testimony, "that [Utah] lawsuit ha[d] ... been resolved."
On November 15, 1991, Judge Stone entered a second "consent order" approving Zip Nut, Inc.'s "offer" (which, according to the appellant's brief was for Zip Nut, Inc. to accept subscription agreements from First Phoenix, Inc. investors and to accept the assignment of patent rights for the zip nut after the Utah federal litigation was dismissed), and, among other things, dismissing without prejudice the complaint and receivership as to Fullerton Design, First Phoenix, and Crescent Products upon their merger into Zip Nut, Inc. The receivership was maintained over Fullerton and Bennett, requiring Callister's approval before either could vote any shares or assign any interests.
Judge Stone later signed an affidavit (filed in the criminal proceedings) describing the intended effect of the two consent orders and the factual findings necessary to support them:
3. After extensive hearings, conferences with the attorneys, review of many documents, affiant determined that a prima facie showing of fraud by Robert Fullerton in his dealings with the First Phoenix investors did not exist. On two occasions, affiant made statements to this effect in open court to the assembled attorneys and investors.
4. The foregoing finding was essential to continue the civil proceedings in the manner they were conducted. This determination that there was no fraud necessarily led to the court orders consolidating the several corporate entities into Zip Nut, Inc., allowing Robert Fullerton to retain a majority ownership interest in Zip Nut, Inc., and the election offered to the First Phoenix investors to accept stock in Zip Nut, Inc. or a promissory note by Zip Nut, Inc. in an amount equal to their investment plus interest.[[3]]
5. If the State of Nevada or any other party to the civil action had proffered prima facie evidence of fraud, affiant would not have proceeded with the case in the manner above-described. The Deputy Attorney General in the civil case told me on at least one occasion in chambers that no criminal action would be filed by the State in this matter. If the State of Nevada had informed affiant that it was going to proceed with a criminal prosecution of Robert Fullerton for the same acts and conduct which was alleged in the civil action, affiant would have taken measures to stay the civil action to ensure against a conflict in the proceedings.
In an affidavit filed March 29, 1993, the Deputy Attorney General who handled the civil case against respondents disputes Judge Stone's statement that Stone was told no criminal action would be taken. This affidavit refers to a December 6, 1991, application and order submitted by Callister and signed by Judge Stone which stated that criminal charges may be brought. However, respondents allege it was this reference to the possibility of criminal charges which prompted Judge Stone to inquire about the matter.
On December 6, 1991, an order was entered in the Utah action, adopting the terms of the stipulation and settlement that had been filed therein and dismissing that action, contingent upon the terms of the settlement agreement, and declaring the December 1988 dissolution of Fullerton Inc., to be invalid.[4]

Procedural history of the criminal action
On January 10, 1992, Deputy Attorney General Grenville Pridham sent a Notice of Intent to Seek Indictment to various attorneys he believed represented Fullerton. One *707 of the attorneys to whom this notice was sent was John Schell. However, according to the respondents' brief, Schell, at that time having assumed the presidency of Zip Nut, Inc., "had terminated his representation of the Respondents ... [and] had begun trying to take control of the corporation, and with it the right to develop the patented product, away from Fullerton." Unrelated difficulties with the county grand jury delayed the criminal case until June 18, 1992, at which time a criminal complaint was filed charging Fullerton and Bennett with multiple violations of Nevada's Uniform Securities Act and racketeering. Later, Notices of Intent to Seek Indictment were sent again.
Respondents aver that at some time in the fall of 1992, Schell hired Dominic Gentile's law firm to represent Zip Nut, Inc.'s interest in the criminal matter and pursue any possible third-party claims Zip Nut might have against respondents.[5]
The grand jury proceedings were held on November 18, 1992, and included the testimony of thirteen First Phoenix investors identified in the indictment, as well as testimony by the receiver, Matthew Callister. Respondents argue this hearing was flawed in that the prosecutor failed to present exculpatory evidence, such as that the thirteen testifying investors had elected to obtain stock in Zip Nut, Inc.; that Judge Stone had found against fraud; and that Fullerton owned Crescent Products, to which the patent had been assigned.
In any event, the grand jury returned a true bill and an indictment was filed on the same day charging respondents with multiple counts of violating the same provisions of NRS Chapter 90 (NRS 90.310, 90.460, 90.570) as alleged in the civil complaint; four counts of obtaining money under false pretenses, in violation of NRS 205.380 (these four counts were later voluntarily dismissed by the State, see infra); and racketeering, in violation of NRS 207.400. The last two charges were in addition to the statutes identified in the civil complaint as having been violated, but were based upon the same conduct which formed the basis for the securities violations.
At their arraignment on December 11, 1992, respondents entered a plea of not guilty; thereafter, respondents filed a motion for discovery which was heard on January 29, 1993. At the hearing, respondents' counsel argued that Schell may have divulged information that was subject to the attorney-client privilege during the course of consultations between Schell and the State and between Schell and Callister (no specificity was provided as to what privileged information may have been revealed). Prosecutor Pridham denied this, stating
Mr. Schell or Mr. Callister did not consult with me to enable me to write my indictment or criminal complaint.... I have spoken with Mr. Schell, but he's indicated that he has the attorney-client privilege.... I know I didn't use anything Mr. Schell told me in preparation of any indictment. In fact, I don't even think Mr. Schell knew I was seeking an indictment until a true bill was found.
On January 29, 1993, respondents petitioned the court for a writ of habeas corpus, alleging, among other things, that their rights under the double jeopardy and due process clauses of the U.S. and Nevada Constitutions were violated. On March 19, 1993, respondents also filed a motion to dismiss for prosecutorial misconduct. The latter motion alleged, Pridham's disavowals at the discovery hearing notwithstanding, that Pridham had in fact worked very closely with Schell through Dominic Gentile, the attorney Schell had hired to represent Zip Nut, Inc., in preparing and initiating the criminal charges against respondents. The motion was supported by a billing statement from Gentile's law firm charging Zip Nut, Inc. c/o John T. Schell, for services rendered. This statement (which appellant asserts was stolen from the offices of Zip Nut, Inc.)[6] showed that Gentile, in his representation of Schell's *708 interests as president of Zip Nut, Inc., had assisted Pridham with the preparation of the criminal action against Schell's former clients and reflects numerous telephone as well as personal conferences between Schell, Gentile, and prosecutor Pridham. For example: On November 12, 1992, Gentile's activities included "Telephone conf. with John Schell; telephone conference with Grenville Pridham; commenced preparation by reviewing documents received from Schell; legal research re best RICO approach." On November 13, 1992, Gentile held a "conference with Grenville Pridham at his office and reviewed his witness list and original draft of proposed indictment." On November 16, 1992, Gentile conducted "Legal research and telephone conferences with Grenville Pridham re eliminating most of the alternative RICO counts and settling upon one or two solid ones. Substantial factual discussion during these conversations." On November 17, 1992, Gentile held "multiple telephone conferences with John Schell and Grenville Pridham." On November 19, 1992, Gentile held a "telephone conf. with Grenville Pridham re modification of Proposed Indictment."[7]
On April 22, 1993, a hearing was held before District Judge Agosti on Fullerton and Bennett's petition for a writ of habeas corpus and motion to dismiss. The State voluntarily moved to dismiss all four counts of obtaining money under false pretenses for failure to correctly instruct the grand jury as to that crime; accordingly, these counts were dismissed. Before hearing argument, testimonial evidence was presented to Judge Agosti that Pridham had, in another matter similar to the zip nut case, sought to use the receiver in a civil proceeding as a witness in a parallel criminal prosecution, as he had done here.[8] During oral argument, Pridham now acknowledged that he had had many conversations with Schell's attorney prior to the indictment.
After hearing the various arguments, Judge Agosti dismissed all remaining counts with prejudice as having violated the petitioners' rights against double jeopardy (due to the "nonremedial" nature of the sanctions sought in the civil proceeding) and to due process (due to the use of information obtained by the receiver). Additionally, the district court ruled that in the event of an appeal by the State, and a subsequent reinstatement of the criminal charges, the Attorney General's office should be disqualified as the prosecutor because it had acted under a conflict of interest. Thereafter, on May 3, 1993, Judge Agosti entered an "order granting petitions for writ of habeas corpus and motion to dismiss" substantially coinciding with her oral recitations at the hearing.
This appeal ensued.

DISCUSSION

Whether the criminal charges were properly dismissed for violating respondents' double jeopardy rights
Pursuant to Nevada's enactment of the Uniform Securities Act, the State may proceed civilly as well as criminally in a case like this. NRS 90.615-.660. The institution of parallel civil and criminal proceedings does not constitute a per se violation of the Double Jeopardy Clause. See United States v. Kordel, 397 U.S. 1, 11, 90 S.Ct. 763, 769, 25 L.Ed.2d 1 (1970). However, under certain circumstances a civil penalty may constitute punishment under the double jeopardy clause. United States v. Halper, 490 U.S. 435, 446-51, 109 S.Ct. 1892, 1900-03, 104 L.Ed.2d 487 (1989).
*709 In Halper, the Court held that a defendant already punished in a criminal prosecution could not be subjected to an additional civil sanction to the extent that the second sanction served the punitive purposes of retribution or deterrence. Id. at 448-49, 109 S.Ct. at 1901-02. In the instant case, the criminal prosecution followed the civil litigation, but it seems clear that double jeopardy is implicated regardless of the order of the proceedings. See, e.g., United States v. Sanchez-Escareno, 950 F.2d 193, 200 (5th Cir.1991), cert. denied, 506 U.S. 841, 113 S.Ct. 123, 121 L.Ed.2d 78 (1992) ("the Halper principle that a civil penalty can be factored into the double jeopardy matrix should apply whether the civil penalty precedes or follows the criminal proceeding").
We conclude that no double jeopardy violation occurred in the case before us simply because respondents in this case have not been assessed any penalties in the civil proceeding. It appears that the Double Jeopardy Clause does not apply when a civil award for an offense punished criminally is merely sought but not assessed. See United States v. Reed, 937 F.2d 575, 578 (11th Cir.1991) ("Because no damage award has been imposed on defendant, the Halper test comparing money damages with the government's loss is inapposite to the facts of this case."); Manocchio v. Kusserow, 961 F.2d 1539, 1542 (11th Cir.1992) (where no monetary damages have been assessed, Halper does not apply); cf. Sanchez-Escareno, 950 F.2d at 200-01 (assessment of fines did not constitute punishment under the Double Jeopardy Clause where the government had not yet sought to enforce them).
Therefore, the district court erred in concluding that the State's actions in bringing the criminal charges against respondents violated respondents' rights under the Double Jeopardy Clause.

Whether the prosecutor's use of the civil receiver constituted a violation of respondents' due process rights justifying dismissal
Appellant argues that there is no known privilege which would have kept respondents' civil receiver, Matthew Callister, from testifying before the grand jury.
Appellant also points to the Kordel decision, cited above, as an example of a case where the U.S. Supreme Court declined to overturn a parallel criminal conviction although certain discovery in the government's civil case may have been helpful in the pursuit of criminal charges. Using Kordel for support, appellant argues that although items turned over to the receiver may have helped the State's criminal case, this does not constitute grounds for dismissal where the receiver has not been shown to have acted at the State's direction in obtaining information. Moreover, appellant contends that respondents failed to satisfy their burden of proving that the State engaged the receiver to obtain information for use by the State in criminally prosecuting respondents.
In Kordel, a company president and vice-president were convicted for the misbranding of drugs in violation of federal law. The government took both civil and criminal action against the offenders. In view of the criminal charges, defendants sought a stay in the civil matter and from the civil discovery procedures. The stay was denied, thus prompting the vice-president to answer the civil interrogatories. The civil matter was thereafter settled, but criminal indictments followed, which later resulted in convictions. The court of appeals reversed the convictions due to the possibility that interrogatories answered in the civil case had given the government useful leads, thereby violating the parties' privilege against self-incrimination. The Supreme Court reversed, reasoning that neither party was obligated to answer the interrogatories, but could have "invoked [the] Fifth Amendment privilege against compulsory self-incrimination" and passed the interrogatories to some other corporate officer whose answers would not be self-incriminating. Kordel, 397 U.S. at 7-8, 90 S.Ct. at 766-68.
In essence, the Supreme Court merely rejected the factual analysis of the court of appeals, which had reasoned that the evidence was submitted to the government under threat of forfeiture. However, the Kordel Court did affirm that "[t]he Court of Appeals was correct in stating that `the Government *710 may not use evidence against a defendant in a criminal case which has been coerced from him under penalty of either giving the evidence or suffering a forfeiture of his property.'" Id. at 13, 90 S.Ct. at 770. The Court also noted that "[w]e do not deal here with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution...." Id. at 11-12, 90 S.Ct. at 769.
The respondents assert that the receivership was improperly used to build a case or garner evidence for this eventual criminal action. However, the State and the receiver steadfastly deny this allegation, and the prosecutor asserts that the vast majority of the evidence to be used in the prosecution could have been obtained from sources other than from the receivership action. Since no evidentiary hearing was held on this issue, we have no idea what proposed evidence will be part of the State's case and what items could not have been secured but for the receivership action. In short, we are left with conflicting statements of counsel.
The evidence concerning whether the respondents were advised of the possibility of a criminal prosecution is equally equivocal. Judge Stone presided over the receivership case and filed an affidavit in the criminal action that stated the respondents were not advised during the receivership that a criminal prosecution was contemplated. However, the judge signed an order in December 1991 where he expressly stated just the opposite: "The Nevada State Securities Commission is still investigating Defendant Fullerton's activities and criminal charges may be brought." The prosecutor maintains that the respondents were well aware throughout the processing of the receivership action that prosecution was a distinct possibility. Again, conflicting claims with little persuasive evidence on either side. While we have no problem following the dictates of the Kordel decision, the evidence is insufficient to establish that the receivership action was improperly used and that the respondents did not know that prosecution was a possibility.
The evidence to support the district court's finding of a conflict of interest on the part of the attorney general's office is equally problematic. The district court found that the criminal complaint included a RICO charge for which the State sought forfeiture of the respondents' property and Mr. Fullerton's patent. This would have benefited the investors and John Schell, who had represented Fullerton but then ousted Fullerton from corporate control and became President of Zip Nut, Inc. The court also observed that the deputy attorney general had several substantive consultations with Dominic Gentile who was retained by Zip Nut, Inc. and John Schell after Schell had replaced Fullerton; these conversations included the criminal charges to be pursued against the respondents, the witnesses to be called to testify, and factual and legal advice relevant to the forfeiture of the patents.
The district court relied upon the billings of attorney Gentile in making the finding that a conflict of interest existed because Gentile was representing Schell and Gentile had conversations with the prosecutor. The assumption is that Gentile revealed confidential information acquired from Schell to the prosecutor. Gentile's legal billings show calls to the deputy attorney general about the RICO charges to be stated in the complaint and that the conversations were "factual and substantial." However, we do not know what specific facts were discussed by Gentile and the prosecutor, whether confidential conversations between Schell and the respondents were revealed, or on the other hand whether the discussion merely centered around how to charge a RICO violation and the evidence that was publicly known or legally obtained. Neither the depositions of Dominic Gentile nor the deputy attorney general was ever taken. The deputy attorney general adamantly denies that he secured any privileged information from Gentile. While conversations between a prosecutor and a defendant's former attorney rightfully raised the district judge's concern, the factual content of these conversations is not in the record, and without this information, it cannot be determined whether *711 confidential information was improperly secured by the State.

CONCLUSION
We conclude that the evidence before the district court did not support the findings that the respondents' due process rights were violated by the prosecution's improper use of the civil proceeding or that the State had a conflict of interest. Before this court will dismiss a case for prosecutorial misconduct, the misconduct must be clearly demonstrated to be substantial and prejudicial. See State v. Tapia, 108 Nev. 494, 835 P.2d 22 (1992). Further, a prosecuting attorney's office should not be disqualified for a conflict of interest unless evidence establishes that an extreme situation exists. Collier v. Legakes, 98 Nev. 307, 646 P.2d 1219 (1982). Since such a showing was not made by the respondents, the district court erred in dismissing this action and granting the writs of habeas corpus. Accordingly, we reverse the granting of the writs of habeas corpus and the dismissal of this case and remand to the district court for trial.
YOUNG and SHEARING, JJ., concur.
STEFFEN, C.J. and SPRINGER, J., dissent.
STEFFEN, C.J., with whom SPRINGER, J., joins, dissenting:
I agree that there was no double jeopardy violation in the proceedings below but conclude that the district court was correct in determining that due process violations justified granting the petitions for writs of habeas corpus and the dismissal of the criminal counts against Fullerton and Bennett with prejudice. I therefore dissent.
It is apparent to me that Judge Agosti surveyed with justifiable alarm the number and nature of intersecting factors between the civil proceeding and receivership against Fullerton and Bennett on the one hand, and the criminal proceedings resulting in their respective indictments on the other. After evaluating these factors, the district judge concluded that it would not be possible to clothe any criminal convictions against the beleaguered inventor and his associate with sufficient indicia of due process to satisfy constitutional scrutiny. I agree.
The State of Nevada, through the Attorney General, filed a civil complaint for securities fraud and the appointment of a receiver against Fullerton, various corporations and Bennett.[1] District Judge Stone, who presided over the securities fraud and receivership case, determined that there was no fraud and that Fullerton, the inventor of what appears to be a highly utilitarian product known as a "zip nut," was simply a poor businessman. Although it is unnecessary to repeat the factual and procedural recitals in the majority opinion, it should be emphasized that the receiver, Matthew Callister, "took possession of all of Fullerton's and Bennett's personal papers, questioned them regarding their sources of income and expenditures, and took control of all personal and corporate bank accounts, requiring respondents to also give him monthly financial reports."
The civil action eventuated in a consent order that paved the way for a merger of a number of Fullerton's corporations and a reorganization plan that were designed to facilitate the licensing, manufacture and distribution of the zip nut under the apparent operative control of investor/attorney John Schell, who had represented the defendants in the civil proceeding and receivership. Zip Nut, Inc. was to be the vehicle through which the product would be marketed and investors would be made whole. As a result, Zip Nut, Inc. was released from the receivership, but Fullerton and Bennett remained under the control and monitoring of the receiver.
At a hearing held before Judge Stone on November 7, 1991, the judge repeated his earlier observations that "I don't think Mr. Fullerton is a crook, I think he is a lousy businessman, but he has not intentionally tried to deprive anything of anybody [sic], and that's the bottom line here." Judge Stone eventually filed his affidavit in the criminal proceedings describing the intended effect of the two consent orders he issued in the civil action, and their factual underpinnings. *712 In pertinent part, his affidavit declared:
3. After extensive hearings, conferences with the attorneys, review of many documents, affiant determined that a prima facie showing of fraud by Robert Fullerton in his dealings with the First Phoenix investors did not exist. On two occasions, affiant made statements to this effect in open court to the assembled attorneys and investors.
4. The foregoing finding was essential to continue the civil proceedings in the manner they were conducted. This determination that there was no fraud necessarily led to the court orders consolidating the several corporate entities into Zip Nut, Inc., allowing Robert Fullerton to retain a majority ownership interest in Zip Nut, Inc., and the election offered to the First Phoenix investors to accept stock in Zip Nut, Inc. or a promissory note by Zip Nut, Inc. in an amount equal to their investment plus interest.
5. If the State of Nevada or any other party to the civil action had proffered prima facie evidence of fraud, affiant would not have proceeded with the case in the manner above-described. The Deputy Attorney General in the civil case told me on at least one occasion in chambers that no criminal action would be filed by the State in this matter.[2] If the State of Nevada had informed affiant that it was going to proceed with a criminal prosecution of Robert Fullerton for the same acts and conduct which was alleged in the civil action, affiant would have taken measures to stay the civil action to ensure against a conflict in the proceedings.
....
7. Affiant was not informed that the receiver, Matthew Callister, had been subpoenaed to testify before the grand jury. If affiant had been so informed prior to his appearance, affiant would have ordered the subpoena quashed.
In seeking habeas relief on double jeopardy and due process grounds, and a dismissal of charges based upon prosecutorial misconduct, respondents brought a number of interesting and rather compelling facts to light. In support of the motion to dismiss, Fullerton and Bennett postulated that the Deputy Attorney General, Grenville Pridham, may have received privileged information from attorney John Schell either directly or through the receiver or another attorney. Pridham's denials notwithstanding, several factors remain a thorn in the State's side.
First, it is worthy of emphasis that attorney John Schell was not only an investor in First Phoenix, he was one of the attorneys who represented respondents in the civil action and receivership brought by the Attorney General. As noted by the majority, respondents' brief indicated that Schell testified "that he had advised Fullerton that sales of First Phoenix stock did not violate the Utah injunction, and that Fullerton was not required to apprise the First Phoenix investors of either the Utah injunction or the assignment to Crescent Products since neither posed a risk to the investors."[3] Apparently Schell saw the economic potential of the zip nut, for respondents' recitals indicate that Schell (who had been given notice of the intent to seek indictment by Pridham because he believed Schell represented Fullerton) had become president of Zip Nut, Inc., had terminated his representation of the respondents, and was seeking to take control of the corporation from *713 Fullerton and with it the right to proceed with the development and marketing of the zip nut. It certainly must be presumed that Schell was totally knowledgeable about all aspects of respondents' activities with the patented product and the corporate entities connected to the product.
Although Pridham denied consulting with Schell and Callister in the preparation of the indictment or criminal complaint, Fullerton and Bennett obtained evidence strongly suggesting that Pridham had in fact worked very closely with Schell through attorney Dominic Gentile, the attorney whom Schell had allegedly retained to represent Zip Nut, Inc., in the preparation of criminal charges against respondents. The evidence consisted of a billing statement sent by Gentile's law firm to the attention of Schell, charging Zip Nut, Inc. for services rendered. This statement (which allegedly was purloined from the offices of Zip Nut, Inc.) indicated that Gentile, in representing Schell's interests as president of Zip Nut, Inc., had assisted Pridham in preparing the criminal action against Schell's former clients (and apparent competitors for control in the marketing of the zip nut). The statement evinces numerous telephonic and personal conferences between Schell, Gentile, and prosecutor Pridham. As a meaningful example noted by the majority, on November 12, 1992, Gentile's activities were characterized on the statement as "Telephone conf. with John Schell; telephone conference with Grenville Pridham; commenced preparation by reviewing documents received from Schell; legal research re best RICO approach." Additional notations, also identified in the majority opinion, included: (1) an entry for November 13, 1992, indicating that Gentile held a "conference with Grenville Pridham at his office and reviewed his witness list and original draft of proposed indictment;" (2) an entry for November 16, 1992, indicating that Gentile conducted "Legal research and telephone conferences with Grenville Pridham re eliminating most of the alternative RICO counts and settling upon one or two solid ones. Substantial factual discussion during these conversations;" (3) an entry for November 17, 1992, indicating that Gentile held "multiple telephone conferences with John Schell and Grenville Pridham;" and (4) an entry bearing what appears to be an erroneous date of November 19, 1992 (the indictment against respondents was filed on November 18, 1992), indicating that Gentile had conferred with Pridham by telephone "re modification of Proposed Indictment."
The foregoing contacts between Fullerton's former counsel and intended successor, Schell, and Dominic Gentile, the attorney retained by Schell to represent the interests of Zip Nut, Inc. (and hence Schell's own interests) and prosecutor Pridham, reflect a high level of cooperation among individuals who had direct access, through Schell, to privileged information received by Schell during his representation of Fullerton. Moreover, appearances of impropriety increase with the realization that Schell stood to personally benefit from helping to separate his former client, Fullerton, from the zip nut which Fullerton had invented and protected by patent.
In addition to the foregoing, the testimony of the receiver, who had been appointed at the behest of the Attorney General in the civil proceeding, before the grand jury was an added factor that caused Judge Agosti to comment that:
it is inappropriate to utilize the testimony of a receiver when the receiver was appointed at the State's behest, and then thereafter manipulated to obtain information in order to make a criminal prosecution work. In other words, to circumvent the due process rights of these defendants... [t]he receiver went out and just seized everything ... [and] was subsequently subpoenaed.... [Whereas] [t]here would have to be an up-front criminal prosecution going on to get a search warrant.
As the majority opinion observes, Judge Agosti obviously agreed that the civil proceeding had been used as a subterfuge to develop evidence for a criminal prosecution.
Judge Agosti's order granting respondents' petitions for writ of habeas corpus and motion to dismiss essentially coincided with her oral recitations at the hearing:
Among the remedies sought by the state [in its civil action] was forfeiture of a device *714 commonly known as the "Zip Nut,"... as well as ... stock in the several corporate entities.... During the course of the civil case, both of the Defendants provided information ... to the Receiver... the prosecutor [has] acknowledged ... that this seizure of Defendants' papers and their interviews would have had to comport with the Fourth and Fifth Amendments of the Constitution had a criminal prosecution been pending.
After the Court had made significant determinations in the civil case against the State's interest ... the Attorney General decided to pursue this criminal action[ ]... [and] filed a criminal complaint in which the same alleged fraudulent sales transactions of First Phoenix, Inc. securities were charged against the Defendants. The complaint ... sought forfeiture of the Defendants' property and Mr. Fullerton's patent.... [B]ased in significant part upon the testimony of the Receiver ... an Indictment was returned in November 1992. Also, it is undisputed that the Deputy Attorney General had several substantive consultations with an attorney retained by the Defendants' former attorney [in the civil matter], John Schell, regarding the criminal charges.... It is undisputed that these consultations occurred during the time John Schell [as President of Zip Nut, Inc.] was contesting Robert L. Fullerton's rights to the patent and that forfeiture of the patent and the Defendants' property would inure to the benefit of John Schell. These consultations make manifest the Attorney General's conflict of interest in that this criminal prosecution is an attempt by the State to satisfy civil litigants and to obtain for them by the criminal action that which the State has been unable to obtain in the civil case. [Accordingly] the Court makes the following conclusions of law:
....
The manner in which the State has proceeded against the Defendants through the civil case and then the criminal case has violated the Defendants' rights under the Due Process of Law Clause and the Double Jeopardy Clause. Therefore, all remaining criminal charges in the Indictment are dismissed with prejudice.
If this conclusion is reversed and the criminal action reinstituted, the Nevada Attorney General's Office is disqualified to prosecute it.
The majority has concluded that the prosecutor's use of the civil receiver did not adversely impact respondents' due process rights. I do not agree, especially when viewed in combination with the attorney general's rather extensive involvement with Fullerton's former counsel, John Schell, through Schell's surrogate, attorney Dominic Gentile.[4]
The United States Supreme Court, in United States v. Kordel, 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970) affirmed that "[t]he Court of Appeals was correct in stating that the Government may not use evidence against a defendant in a criminal case which has been coerced from him under penalty of either giving the evidence or suffering a forfeiture of his property.'" Id. at 13, 90 S.Ct. at 770. If Fullerton and Bennett did in fact agree to the appointment of a receiver, as they assert, they apparently did so in order to retain some interest in the assets which the State's complaint sought to secure from them. The evident alternative to the receiver appeared to be the complete forfeiture of any hoped-for future interest in their valuable assets, including the zip nut patent. Moreover, the Kordel Court stated that
where no one [in the company] can answer the
[civil] interrogatories addressed to the corporation without subjecting himself to a "real and appreciable" risk of self-incrimination[]... we may assume that in such a *715 case the appropriate remedy would be a protective order ... postponing civil discovery until termination of the criminal action.
Id. at 8-9, 90 S.Ct. at 768. This is, of course, pertinent in light of Judge Stone's affidavit stating that he would have postponed the civil matter, and quashed the appearance of the receiver in the criminal matter, had he known the criminal matter was pending.
Even more germane here perhaps, is the ruling in Kordel rejecting the offenders' argument that their due process rights had been violated. The Court noted that "[w]e do not deal here with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution...." Id. at 11-12, 90 S.Ct. at 769.
Assuming, logically, that civil seizure is tantamount to civil discovery proceedings, respondents' civil rights may have been violated if the civil receivership was used solely to obtain evidence for the criminal case, or if the respondents were never advised, upon stipulating to and cooperating with the receiver, that a criminal case might be pending. Applying these factors to the instant case, Judge Agosti's statements at oral argument seem to indicate her belief that the civil case may have been brought to obtain evidence for the criminal prosecution, a belief that is certainly not without support.
There is, moreover, an evidentiary basis in the record for concluding that respondents were not advised during the receivership that a criminal prosecution was contemplated. For example, Judge Stone's affidavit indicates that opposite assurances were given. It is also clear, from his own statements in the record, that the prosecutor refused to inform respondents that criminal charges were going to be brought, although he was personally and "pointedly" asked the question on the very day that he filed the criminal complaint.[5]
Although no focused evidentiary hearing was held by the district court to determine whether the State filed the civil action solely as a means of providing evidence for the criminal prosecution, or at what point respondents were aware of the possibility of criminal charges, there is nevertheless support for the conclusion that Pridham's use of the civil receiver as a source of information and testimony deprived respondents of their rights to due process.
The receiver was able to seize information and evidence without a warrant, which was later relied upon by the prosecutor. In the absence of the civil action, the State would have had to obtain a warrant to secure the same information and evidence to support criminal proceedings against respondents. Kordel lends support for the proposition that the complex of factors existing here violates due process since there is record evidence indicating that the State failed to advise respondents in the civil proceeding that it contemplated their criminal prosecution. I must thus conclude that the ruling of the district court is entitled to deference and affirmance for the reason stated. Where, as here, there *716 is conflicting evidence, this court should not interfere with the findings of the district court.
For the reasons discussed above, I find ample reasons for deferring to the two district court judges who heard the evidence and observed the demeanor of witnesses and counsel in the civil and criminal proceedings against Fullerton and Bennett, and would affirm Judge Agosti's rulings granting habeas corpus and dismissing the criminal counts against respondents with prejudice. It strongly appears that when the State failed to wrest Fullerton's patented invention from him through the civil action and receivership, it then turned to a criminal proceeding based upon the same facts in order to accomplish what it failed to accomplish in the civil matter. I believe that both Judge Stone and Judge Agosti saw through to the heart of the matter and should be affirmed on grounds that respondents have been denied their rights to due process. I therefore dissent.
SPRINGER, J., concurs.
NOTES
[1] The Attorney General's office served as counsel for the State in this case. On November 19, 1991, Nevada's civil complaint was amended to add Bennett as a defendant. Also, according to the receiver's testimony before the grand jury, the complaint was later further expanded, by order or amended complaint, to include Fullerton Zip Nut, Inc., a Utah corporation, and Fullerton, Inc., a Nevada corporation (the two corporations involved in the Utah litigation).
[2] The respondents neither confirm nor deny that this occurred in their brief, but merely point out that the statement was made by the prosecutor, adding: "If this [is] true, the Respondents were represented by John Schell."
[3] Respondents maintain that the investors named in the indictment accepted the option of stock in Zip Nut, Inc. However, appellant asserts that five First Phoenix investors elected to have a return of their investment funds, through promissory notes, as no cash existed to pay them back.
[4] We also note that on March 15, 1992, Bennett and Fullerton unsuccessfully filed a motion to have the receivership terminated. This court, on appeal from the denial of the motion to terminate the receivership, determined that the purposes of the receivership had not yet been fulfilled and accordingly issued an order dismissing appeal on March 31, 1994. See Fullerton v. State, Docket No. 24398, ___ Nev. ___, 893 P.2d 402 (Order Dismissing Appeal, March 31, 1994).
[5] Respondents rely for this assertion upon an unsigned, unnotarized affidavit of Zip Nut, Inc., on Gentile's law firm's letterhead, and upon certain billing statements discussed more fully infra.
[6] According to statements made by Fullerton's counsel at the hearing on the motion to dismiss and the habeas petition, these documents were sent to Fullerton by one of Schell's employees who was thereafter fired.
[7] Since the indictment was filed on November 18, 1992, it is unclear whether this date on Gentile's billing statement is correct.
[8] Respondents did not argue that it was inappropriate per se for a civil receiver to act as a witness in a criminal prosecution, but (in the words of Judge Agosti) that

it is inappropriate to utilize the testimony of a receiver when the receiver was appointed at the State's behest, and then thereafter manipulated to obtain information in order to make a criminal prosecution work. In other words, to circumvent the due process rights of these defendants ... [t]he receiver went out and just seized everything ... [and] was subsequently subpoenaed.... [Whereas] [t]here would have to be an up-front criminal prosecution going on to get a search warrant.
In short, the parties were arguing, and the judge appeared to agree, that "a civil proceeding [had been used] as subterfuge to gain evidence for a criminal proceeding."
[1] As noted by the majority, Bennett and other corporate defendants were later added by amendment to the civil complaint.
[2] This averment is contested by the Deputy Attorney General who handled the civil case against respondents, in an affidavit filed March 29, 1993. This affidavit refers to a December 6, 1991, application and order submitted by Callister and signed by Judge Stone which mentioned the possibility of criminal charges being brought. However, respondents allege, persuasively, that this reference to the possibility of criminal charges prompted Judge Stone to specifically satisfy himself on the subject by personal inquiry. Surely we may assume that Judge Stone would not have positively stated in his affidavit that the Deputy Attorney General told him "on at least one occasion in chambers that no criminal action would be filed by the State in this matter" if in fact no such representation had been made.
[3] I will not burden this dissent with factual background and detail concerning the Utah litigation and the assignment of the zip nut patent to Crescent Products Corporation, as they are sufficiently set forth in the majority's opinion.
[4] I emphasize at this point that I impute no wrongdoing to attorney Gentile who was representing Zip Nut, Inc. He had been engaged by Schell to achieve a result that would inure to the benefit of Zip Nut and Schell, as undoubtedly relayed to Gentile. Moreover, since we do not have actual facts of the disclosures made to Pridham by Schell through Gentile or otherwise, I do not pejoratively characterize Schell's behavior other than to note that it has all the appearances of conduct calculated to prejudice his former client, Fullerton, to Schell's eventual pecuniary advantage.
[5] Specifically, Pridham stated to Judge Agosti, rather inexplicably:

MR. PRIDHAM: And if the defendants are going to make an issue of their lack of notice, or knowledge of all of the State's intention to criminally prosecute them, I personally can testify that on June 18th, 1992, when I came to Reno to file my criminal Complaint, when I did come to the civil hearing to observe Mr. Sourwine specifically and pointedly ask me if there were going to be any criminal charges brought against both of his clients, Miss Bennett and Mr. Fullerton. And both the defendants were within earshot, curiously and eagerly waiting my response.
I informed Mr. Sourwine at that point that we don't confirm or deny the investigation, we don't notify people in advance when  except for notice of Indictment.
THE COURT: Wait a minute, the day you filed... the complaint you wouldn't tell them you did that?
MR. PRIDHAM: I hadn't filed it yet.
THE COURT: You were intending to?
MR. PRIDHAM: Right.
Contrary to the implications at the beginning of his statement, Pridham's comments would seem to establish that respondents did not, in fact, have notice or knowledge of the State's intentions with regard to criminal charges being brought against them as late as June 18, 1992, and that the State's representatives continued to refuse to inform them of any such intentions on the very day that the charges were filed.