131 Nev., Advance Opinion 36

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| STANLEY EARNEST RIMER, Appellant, vs. THE STATE OF NEVADA, Respondent. | No. 58711 |

**FILED**

JUN 11 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of involuntary manslaughter, child abuse or neglect resulting in substantial bodily harm, and five counts of child abuse or neglect. Eighth Judicial District Court, Clark County; Douglas W. Herndon, Judge.

*Affirmed.*

Philip J. Kohn, Public Defender, and Nancy Lemcke, Deputy Public Defender, Clark County,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Steven S. Owens, Chief Deputy District Attorney, and David L. Stanton, Deputy District Attorney, Clark County,
for Respondent.

---

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, DOUGLAS, J.:

Appellant Stanley Earnest Rimer raises numerous claims of error on appeal. We focus on two: (1) whether child abuse and neglect is a continuing offense for purposes of the statute of limitations, and (2)

15 - 17763

whether multiple charges can be properly joined in a single trial if they evince a pattern of abuse and neglect.

To determine whether child abuse and neglect is a continuing offense, we apply the legislative-intent test set forth in *Toussie v. United States*, 397 U.S. 112 (1970). We conclude that the Legislature intended for child abuse and neglect to be treated as a continuing offense and therefore the statute of limitations did not begin to run until the last act of abuse or neglect was completed.

To determine whether multiple charges can be properly joined in a single trial if they evince a pattern of abuse and neglect, we revisit our joinder jurisprudence. We explain that charges are connected together if evidence of either charge would be admissible for a relevant, nonpropensity purpose in a separate trial for the other charge. We conclude that multiple charges that evince a pattern of abuse and neglect are connected together and can be properly joined in a single trial to show intent or lack of accident or mistake. And we reiterate that even when charges have been properly joined, some form of relief may be necessary to avert unfair prejudice to the defendant. There was, however, no unfair prejudice demonstrated in this case sufficient to warrant severance.

We conclude that none of the many claims that Rimer presented for our review warrant relief, and we affirm the judgment of conviction.

## FACTS

Stanley and Colleen Rimer had eight children: Jason, Spencer, Enoch, Quaylyn, Aaron, Crystal, Brandon, and Stanley, III. Their youngest child, Jason, was born on March 11, 2004, and was found dead on June 9, 2008. At the time of Jason's death, Spencer was 9, Enoch was

Supreme Court
OF
Nevada

(O) 1947A

2

11, Quaylyn was 14, Aaron was 15, and Crystal was 17 years old, and Brandon and Stanley were adults.

Jason was born with congenital myotonic dystrophy, a chronic condition that affected his muscles and made it difficult for him to breathe, swallow, talk, and walk. Even at four years old, he walked like a baby, required diapers, and communicated mostly by fussing or screaming. He was treated by a neurologist, a gastroenterologist, a cardiologist, an orthopedist, a speech pathologist, a physical therapist, and a nutritionist. For a while, he was fed through a gastrostomy tube (G-tube) that was inserted through his abdomen so that food could be delivered directly to his stomach. He was happy and liked to play with other children.

During Jason's lifetime, the Rimer home was frequently cluttered: the kitchen and bathrooms went days without being cleaned, the kitchen sink was often filled with dirty dishes, and the laundry room and bedrooms were normally piled with dirty clothing. There were also occasions where dog and bird excrement dirtied the carpet and remained there for days without being removed. Although the Rimers routinely hired housekeepers and carpet cleaners, the house and its carpets quickly became dirty again.

The clutter increased with the decline of Rimer's construction business and the financial slump that followed. Rimer closed his office and vacated his storage units and moved their contents into the house. The presence of construction tools and paint buckets in the house created obvious safety hazards. Although the Rimer family tried to reduce some of the clutter and generate revenue through yard sales, the house was extremely cluttered at the time of Jason's death: the household furniture

had been moved or stacked for carpet cleaning, the kitchen sink was full of dirty dishes, and the fish tanks were green with algae.

The Rimer family continuously struggled with lice. The children were often sent home from school because they had head lice. Usually, they were treated with a lice-killing shampoo and sent back to school, where they were inspected by a nurse before being allowed back in the classroom. For a while, the children's grandmother contributed to this recurring problem by refusing to be treated for lice. There also came a time when the lice-killing shampoo was no longer strong enough to kill the lice, but Rimer was able to find a product online that solved the problem.

The Rimer family did not go hungry. They had refrigerators downstairs in the kitchen and upstairs in the master bedroom. And there were also cases of food in the garage and pallets of food in the living room. They had frozen, refrigerated, canned, and dried food. The children routinely ate food that required little preparation or cooking, and when that sort of food ran out, they went upstairs and asked their parents for more. There was always food downstairs, but sometimes it was only the sort of food that required cooking and no one wanted to cook. Colleen did most of the cooking for the family. On one or two occasions, Quaylyn was punished by receiving only bread and water.

Rimer had a tiered approach to disciplining his children. First, he would place his children in a "timeout" by requiring them to stand in a corner for 5 to 30 minutes, then he would take away their video-game privileges, and finally he would spank them. But if a timeout was not severe enough for the level of misbehavior, the child might be sent to bed without dinner, and if the child's misbehavior involved fighting, the initial punishment might be a spanking.

Rimer spanked his children on their behinds with boat paddles, paint sticks, belts, and his bare hands. The number of spanks in a spanking could range from 1 to 50. Rimer had two wooden boat paddles: one was three to four feet long and the other was two to three feet long. He purchased the second paddle to replace the first paddle and drew shark's teeth on it with a permanent-ink marker. He broke both paddles while spanking his children and repaired them with duct tape. Rimer explained to his children what they did wrong and why they were getting spanked before he spanked them.

Rimer also struck his children. Crystal had seen her father strike Aaron, Quaylyn, Enoch, and Spencer on the chest, stomach, back, and arms for fighting, stealing, or displaying a bad attitude, and she had observed bruises on their arms. Quaylyn said that his father once punched him with a closed fist for misbehaving. Brandon testified that it was pretty common for his father to mete out discipline in anger and before he had calmed down. The worst word that Rimer's children recall him using was "damn," but he sometimes asked his children if they were stupid when they had done something wrong, and he occasionally called Quaylyn "the devil."

Child Protective Services (CPS) received reports accusing Rimer and Colleen of neglecting their children. Walter Hanna, a special education teacher, made several reports concerning Aaron. Aaron suffered from a severe learning disability and was assigned to Hanna's classroom. Hanna called CPS when Aaron came to school with body lice,[1] without

_____

[1]Although Aaron came to school with head lice four or five times a year, both Hanna and the school principal were alarmed when Aaron came to school with body lice.

SUPREME COURT
OF
NEVADA

(O) 1947A

shoes, or without lunch money or a free-lunch form so that he could eat. Likewise, Nicole Atwell, a Nevada Early Intervention Services employee, reported her concerns about Jason. Atwell had previously warned Colleen that Jason should not be fed through his mouth because there was a danger that he might aspirate the food, which could lead to pneumonia or feeding difficulties. When Atwell learned that Jason was being bottle-fed instead of being fed through his G-tube, she felt that Colleen's failure to heed her warning was medical neglect and reported that neglect to CPS.

CPS investigated these and other allegations of neglect and went to the Rimers' house on several occasions. Rimer told his children not to speak with CPS and even rewarded one his sons for refusing to speak to an investigator. He would not allow CPS investigators to go beyond the house's foyer or to speak with his children outside his presence. He also threatened the investigators and complained about their investigations to their supervisors and an assistant manager. Ultimately, CPS investigators concluded that the children were not neglected or at risk and closed the investigations.

Jason was cared for by his mother, brothers, and sister. They changed his diapers, they bathed him, and they fed him. Often, however, Jason's diapers were full and needed changing, the area around his G-tube had not been adequately cleaned and was unsanitary, and his fingernails were dirty. Colleen suffered from adult-onset myotonic dystrophy, digestive tract ailments, and incontinence. She complained that she did not have the strength to lift Jason and stated that she relied upon her sons to get Jason in and out of the family vehicles. Nothing in the trial transcript indicates that Rimer had an active role in Jason's care.

On Sunday, June 8, 2008, Rimer brought Brandon, Aaron, Quaylyn, Enoch, and Spencer to church in his pickup truck. Rimer gave the opening prayer during the church service and then returned home alone. Colleen brought Jason to church in her Ford Excursion. She later brought Aaron, Quaylyn, Enoch, Spencer, and Jason home from church while Brandon remained behind to talk with the bishop about his upcoming church mission. Colleen and the children arrived home at 2:15 p.m. Colleen told Aaron to get Jason out of the Excursion, but neither she nor anyone else ensured that Jason was actually out of the vehicle. Unable to unfasten his seatbelt and open the door, Jason was left trapped and helpless inside the vehicle.

As the afternoon progressed, the children played video games inside and Colleen went upstairs to take a nap. At some point, Colleen asked the children about Jason and asked for their help finding him. She then returned upstairs. Towards evening, Colleen left the house to give Brandon a ride home from the church. She drove the pickup truck because the Excursion was low on gas. Upon returning home, she went back to sleep. Quaylyn wondered where Jason was and looked for him in the rooms downstairs. He did not tell anyone that he could not find Jason, and he assumed that Jason was upstairs with his parents. Quaylyn later went upstairs to speak with his parents about Boy Scout camp. He spoke to his father through a partially opened door and was unable to tell if Jason was in the bedroom. The children made peanut butter and jelly sandwiches for dinner and slept in the family room because their bedrooms were too hot. They did not consider Jason's absence unusual because he routinely stayed with his parents in their bedroom. Nothing in

Supreme Court
of
Nevada

(O) 1947A

7

the trial transcript indicates that Rimer left the bedroom after coming home from church.

On Monday, June 9, 2008, Quaylyn began the morning by getting ready for Boy Scout camp. Colleen was going to take him to the bishop's house and from there they would go to the campground. They were running late, so Colleen told Quaylyn to get in the Excursion. Quaylyn used the key pad to unlock the driver's door and pushed the unlock button to open the passenger doors. When he opened the back door, he saw Jason. At first he thought Jason was sleeping, but when he touched him he knew that Jason was dead.

Brandon awoke to Quaylyn screaming that Jason was dead. Brandon did not believe Quaylyn and went to see for himself. He peered inside the Excursion and saw Jason's body lying on the middle seat. Rimer asked Brandon if Jason was dead and then started the Excursion and rolled down the windows; he did not touch Jason. Brandon returned to the house. He tried to call the bishop, but Rimer took the phone away, told him that his mother was on the phone with the authorities, and asked him to bring Jason's body into the house.

Clark County Fire Department rescue personnel arrived on the scene as Brandon was carrying Jason's body into the house. The rescue personnel observed that Brandon was visibly upset, Quaylyn was crying, and Colleen was upset and sobbing. They described Rimer's demeanor variously as calm, emotionless, in disbelief, and in shock. They entered the house and found Jason laid face up on a couch in the front room. Jason was not breathing, his face had a blanched appearance, his nose was obscured by a "white mucus type substance," and his body was in rigor mortis. They preserved the scene for the police.

Thereafter, Las Vegas Metropolitan Police Department crime scene analysts documented the scene, police detectives interviewed Colleen, and a county medical examiner conducted a forensic autopsy of Jason's body. The medical examiner, Dr. Alane Olsen, determined that the manner of death was homicide because it occurred when other people left the small, disabled child in a car from which he could not escape, and she concluded that the cause of death was environmental heat stress that was brought on by the build-up of heat inside the car. She did not detect any other trauma to Jason's body, but she observed that his fingernails were dirty and his shirt was filthy.

After eight days of trial and three days of deliberation, a jury found Rimer guilty of involuntary manslaughter, child abuse and neglect causing substantial bodily harm, and the five child-abuse-and-neglect counts. The district court imposed various consecutive and concurrent sentences amounting to a prison term of 8 to 30 years. This appeal followed.

## DISCUSSION

### I. *Continuing offenses doctrine*

Rimer claims that the district court erred by refusing to dismiss child-abuse-and-neglect counts 3 through 7 because they violated the statute of limitations by relying upon conduct that occurred outside the three-year statutory limit. The State responds that the district court properly denied the motion to dismiss after concluding that NRS 200.508 plainly contemplates that child abuse and neglect is a continuing offense

and the statute of limitations does not begin to run until the commission of an offense is completed.[2]

"Statutes of limitation ordinarily begin to run when a crime has been completed." *Campbell v. Griffin*, 101 Nev. 718, 722, 710 P.2d 70, 72 (1985). "A crime is complete as soon as every element in the crime occurs." *United States v. Musacchio*, 968 F.2d 782, 790 (9th Cir. 1991). The statute of limitations for felony child abuse and neglect is three years. NRS 171.085(2). Here, the indictment was filed on July 23, 2008, and it alleged that Rimer had committed five felony counts of child abuse and neglect through various acts that occurred between March 11, 2004, and June 9, 2008. Because the alleged period of misconduct exceeded the three-year statute of limitations and the indictment left open the possibility that some of the misconduct occurred outside of the statute, prosecution of the child-abuse-and-neglect counts was barred unless child abuse and neglect is a continuing offense.

"The hallmark of the continuing offense is that it perdures beyond the initial illegal act, and that each day brings a renewed threat of the evil [the Legislature] sought to prevent even after the elements necessary to establish the crime have occurred." *United States v. Yashar*,

---

[2]Child-abuse-and-neglect counts 3 through 7 were charged as violations of NRS 200.508(1), which provides in relevant part that

> [a] person who willfully causes a child who is less than 18 years of age to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect or to be placed in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect . . . is guilty of a . . . felony.

SUPREME COURT
OF
NEVADA

(O) 1947A

166 F.3d 873, 875 (7th Cir. 1999) (internal quotations omitted). To this end, we have determined that insurance fraud, failure to appear, and escape are continuing offenses. Although our decisions have not articulated a standard for identifying continuing offenses, they have focused on the relevant statutory language and legislative intent based on the nature of the offense. *See Perelman v. State*, 115 Nev. 190, 192, 981 P.2d 1199, 1200 (1999) ("[T]he statutory language of NRS 686A.291, taken as a whole, treats insurance fraud as a continuing offense."); *Woolsey v. State*, 111 Nev. 1440, 1444, 906 P.2d 723, 726 (1995) ("[B]ased on the fact that NRS 199.335 is intended to punish those on bail who violate the conditions of their bail by failing to appear before the court when commanded, we conclude that failure to appear is a continuing offense . . . ."); *Campbell v. Griffin*, 101 Nev. 718, 721-22, 710 P.2d 70, 72 (1985) (adopting the reasoning in *United States v. Bailey*, 444 U.S. 394, 413 (1980), to conclude that the Legislature intended for escape to be treated as a continuing offense). Consistent with those decisions, we hold that the proper standard for identifying a continuing offense is the legislative-intent test set forth in *Toussie v. United States*, 397 U.S. 112 (1970). Under this test, we will consider an offense to be a continuing offense only when "the explicit language of the substantive criminal statute compels such a conclusion, *or* the nature of the crime involved is such that [the Legislature] must assuredly have intended that it be treated as a continuing one." *Toussie*, 397 U.S. at 115 (emphasis added).

The explicit language of NRS 200.508 does not compel a conclusion that child abuse and neglect is a continuing offense; however, the nature of the offense demonstrates that the Legislature must have intended for child abuse and neglect to be treated as a continuing offense.

SUPREME COURT
OF
NEVADA

(O) 1947A

11

Child abuse and neglect "is damage to a child for which there is *no* reasonable explanation. Child abuse is usually *not* a single physical attack or a single act of molestation or deprivation. It is typically a pattern of behavior. Its effects are cumulative. The longer it continues, the more serious the damage." Brian G. Fraser, *A Glance at the Past, a Gaze at the Present, a Glimpse at the Future: A Critical Analysis of the Development of Child Abuse Reporting Statutes*, 54 Chi.-Kent L. Rev. 641, 643 (1978) (footnotes omitted); *see also* Lloyd Leva Plaine, Comment, *Evidentiary Problems in Criminal Child Abuse Prosecutions*, 63 Geo. L.J. 257, 258-59 (1974) ("The parents or parent substitutes are the perpetrators in the vast majority of the cases [and] . . . [p]rosecution usually occurs only after a child is killed or so seriously injured that the state decides the welfare of the child would be served best by prosecution of the alleged perpetrator.").

The cumulative nature of the offense is reflected in many of the statutory provisions. For example, individual injuries to a child may not rise to the level of abuse because they do not fit the definition of "physical injury" set forth in NRS 200.508(4)(d), but the cumulative effect of those injuries may be permanent or temporary disfigurement or impairment of a bodily function or organ of the body, and therefore it is the continuing course of conduct that amounts to "abuse or neglect" under the statute. Similarly, it typically would require a pattern of behavior to cause "an injury to the intellectual or psychological capacity or the emotional condition of a child" that is "evidenced by an observable and substantial impairment of the ability of the child to function within a normal range of performance or behavior." NRS 432B.070 (defining

"mental injury"), *referenced in* NRS 200.508(4)(a) (defining "abuse or neglect").

Given the nature of this offense, it is apparent that the child-abuse-and-neglect statute may be violated through a single act but is more commonly violated through the cumulative effect of many acts over a period of time. *See People v. Ewing*, 140 Cal. Rptr. 299, 301 (Ct. App. 1977) (discussing child abuse based on a course of conduct). Consequently, we conclude that the Legislature intended for child-abuse-and-neglect violations, when based upon the cumulative effect of many acts over a period of time, to be treated as continuing offenses for purposes of the statute of limitations. We further conclude that the district court did not err by ruling that counts 3 through 7 of the amended indictment were continuing offenses and that the statute of limitations did not begin to run until the last alleged act of abuse or neglect was completed.

## II. *Joinder and severance*

Rimer claims that the district court erred by denying his pretrial motion to sever the child-abuse-and-neglect counts (the abuse charges) from the second-degree-murder and child-abuse-and-neglect-causing-substantial-bodily-harm counts (the death charges). Rimer argued in the court below that the abuse charges and the death charges were improperly joined under NRS 173.115 and, alternatively, even if the initial joinder was proper, severance was required by NRS 174.165(1) because the joinder was unfairly prejudicial.

 

## A. *Standard of review*

The decision to join or sever charges falls within the district court's discretion. *Weber v. State,* 121 Nev. 554, 570, 119 P.3d 107, 119 (2005). We review the exercise of this discretion by determining whether a proper basis for the joinder existed and, if so, whether unfair prejudice nonetheless mandated separate trials. *Id.* at 571, 119 P.3d at 119. We base our review on the facts as they appeared at the time of the district court's decision. *See People v. Boyde,* 758 P.2d 25, 34 (Cal. 1988); *People v. Brawley,* 461 P.2d 361, 369-70 (Cal. 1969) ("[T]he propriety of the denial of a motion for separate trials must, of course, be tested as of the time of the submission of the motion, and the question of error cannot be determined in the context of subsequent developments at the trial." (citations omitted)). And, if we conclude that the charges were improperly joined, we review for harmless error and reverse only if "the error had a substantial and injurious effect or influence in determining the jury's verdict." *Tabish v. State,* 119 Nev. 293, 302, 72 P.3d 584, 590 (2003) (internal quotations omitted); *see also United States v. Lane,* 474 U.S. 438, 449 (1986).

## B. *Bases for joinder*

A proper basis for joinder exists when the charges are "[b]ased on the same act or transaction; or . . . [b]ased on two or more acts or transactions connected together or constituting parts of a common scheme or plan." NRS 173.115. Here, the abuse charges and the death charges are not based on the same act or transaction and the facts do not demonstrate that Rimer had a single scheme or plan encompassing the abuse of his children and the death of his four-year-old son. Consequently, the charges are only properly joined if they are "connected together."

## 1. *Connected together*

In *Weber*, we clarified that "for two charged crimes to be 'connected together' under NRS 173.115(2), a court must determine that evidence of either crime would be admissible in a separate trial regarding the other crime." 121 Nev. at 573, 119 P.3d at 120. We also stated that evidence of a crime may be admissible in a trial for another crime if it is admissible under NRS 48.045(2) and satisfies the requirements in *Tinch* by being "relevant, . . . proven by clear and convincing evidence, and [having] probative value that is not substantially outweighed by the risk of unfair prejudice." *Id.* (citing *Tinch v. State*, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997)). However, in stating this test for the admissibility of evidence of other crimes, we failed to consider the difference between the procedural issue of joinder of offenses and the evidentiary issue of admitting evidence of "other crimes." *See Solomon v. State*, 646 A.2d 1064, 1066 (Md. Ct. Spec. App. 1994) (observing that the procedural issues of joinder and severance are not the same as the evidentiary issue of "other crimes" evidence and they call for different analyses).

The admissibility of evidence of "'other crimes, wrongs or acts'" is an evidentiary issue that may arise at any time during the course of a trial, and the district court's evaluation of that evidence's relevance, reliability, and risk of unfair prejudice is necessary to ensure that the evidence is subjected to some form of procedural safeguard before it has a chance to influence the jury. *See Petrocelli v. State*, 101 Nev. 46, 51 n.3, 51-52, 692 P.2d 503, 507 n.3, 507-08 (1985) (quoting NRS 48.045(2)), *superseded in part by statute as stated in Thomas v. State*, 120 Nev. 37, 45, 83 P.3d 818, 823 (2004). In contrast, the joinder of offenses is a procedural issue that is decided before a trial and does not compel the same

safeguards as evidence that is introduced after a trial has started. *See generally Brown v. State*, 114 Nev. 1118, 1126, 967 P.2d 1126, 1131 (1998) (recognizing joinder as a procedural rule).

In a joinder decision there is no need to prove a defendant's participation in the charged crimes by clear and convincing evidence because "[a]ll crimes charged, and, therefore, amenable to the possible joinder, are the considered products of grand jury indictments or criminal informations" and therefore are "of equal stature." *Solomon*, 646 A.2d at 1070; *accord State v. Cutro*, 618 S.E.2d 890, 894 (S.C. 2005). Similarly, weighing the probative value of the evidence against the danger of unfair prejudice does not provide a meaningful safeguard against improper joinder because it fails to account for the public's weighty interest in judicial economy, *see Tabish*, 119 Nev. at 304, 72 P.3d at 591; *Solomon*, 646 A.2d at 1071, and the question of unfair prejudice can be addressed separately through the prejudicial joinder statute, NRS 174.165(1). However, the district court must still consider whether the evidence of either charge would be admissible for a relevant, nonpropensity purpose in a separate trial for the other charge, *see generally Bigpond v. State*, 128 Nev., Adv. Op. 10, 270 P.3d 1244, 1249-50 (2012) (modifying the first *Tinch* factor to reflect the narrow limits of the general rule of exclusion), but we conclude that this is the only *Tinch* factor that the district court must consider when deciding whether charges are "connected together" for purposes of joinder.

2. *Admissibility and relevancy*

"The admissibility of evidence of other crimes, wrongs, or acts to establish intent and an absence of mistake or accident is well established, particularly in child abuse cases," *United States v. Harris*, 661 F.2d 138, 142 (10th Cir. 1981), where the State must often "prove its case,

if at all, with circumstantial evidence amidst a background of a pattern of abuse," *United States v. Merriweather*, 22 M.J. 657, 663 (A.C.M.R. 1986) (Naughton, J., concurring). *See Bludsworth v. State*, 98 Nev. 289, 291, 646 P.2d 558, 559 (1982) (evidence of prior injuries is admissible as "independent, relevant circumstantial evidence tending to show that the child was intentionally, rather than accidently, injured on the day in question"); *Ashford v. State*, 603 P.2d 1162, 1164 (Okla. Crim. App. 1979) (evidence of "past injuries [is] admissible to counter any claim that the latest injury happened through accident or simple negligence. The pattern of abuse is relevant to show the intent of the act."); *State v. Widdison*, 4 P.3d 100, 108 (Utah Ct. App. 2000) ("Evidence of prior child abuse, both against the victim and other children, is admissible to show identity, intent, or lack of accident or mistake."); *see also State v. Taylor*, 701 A.2d 389, 395-96 (Md. 1997) (gathering cases). Here, the abuse charges and the death charges were connected together because evidence from these charges demonstrated a pattern of abuse and neglect that would have been relevant and admissible in separate trials for each of the charges. Accordingly, we conclude that the joinder of these charges was permissible under NRS 173.115.

C. *Prejudicial joinder*

Even when charges have been properly joined, some form of relief may be necessary to avert unfair prejudice to the defendant. NRS 174.165(1) provides that "[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses . . . in an indictment . . . , the court may order an election or separate trials of counts, . . . or provide whatever other relief justice requires." The defendant must demonstrate to the district court that the joinder would be unfairly prejudicial; this requires more than a mere showing that severance may improve his or her chances for

acquittal. *Weber*, 121 Nev. at 574-75, 119 P.3d at 121. Courts construing NRS 174.165(1)'s federal cognate

> have identified three related but distinct types of prejudice that can flow from joined counts: (1) the jury may believe that a person charged with a large number of offenses has a criminal disposition, and as a result may cumulate the evidence against him or her or perhaps lessen the presumption of innocence; (2) evidence of guilt on one count may "spillover" to other counts, and lead to a conviction on those other counts even though the spillover evidence would have been inadmissible at a separate trial; and (3) defendant may wish to testify in his or her own defense on one charge but not on another.

1A Charles Alan Wright & Andrew D. Leipold, *Federal Practice and Procedure* § 222 (4th ed. 2008). We have recognized that the first of these types of prejudice may occur when charges in a weak case have been combined with charges in a strong case to help bolster the former. *Weber*, 121 Nev. at 575, 119 P.3d at 122.

Like its federal counterpart, NRS 174.165(1) "does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993). "To *require* severance, the defendant must demonstrate that a joint trial would be manifestly prejudicial. The simultaneous trial of the offenses must render the trial fundamentally unfair, and hence, result in a violation of due process." *Honeycutt v. State*, 118 Nev. 660, 667-68, 56 P.3d 362, 367 (2002) (emphasis added) (internal quotations omitted), *overruled on other grounds by Carter v. State*, 121 Nev. 759, 765, 121 P.3d 592, 596 (2005). To resolve a motion to sever, the district court must first determine whether the joinder is manifestly prejudicial in light of the unique facts of

the case and then decide "whether [the] joinder is so manifestly prejudicial that it outweighs the dominant concern [of] judicial economy and compels the exercise of the court's discretion to sever." *Tabish*, 119 Nev. at 304, 72 P.3d at 591 (internal quotations omitted).

Here, the district court expressly rejected the argument that the abuse charges unfairly bolstered the death charges because Rimer was directly implicated in the abuse charges but only indirectly implicated in the death charges. Our review of the record shows that all of the charges were strong and none of the charges were so weak as to suggest a due process violation. Accordingly, we conclude that the district court did not abuse its discretion in this regard.

## III. *Remaining claims*

We briefly address Rimer's remaining claims although none of them warrant reversal.

### A. *Sufficiency of the evidence*

Rimer claims that the State failed to present evidence that he caused his children to suffer unjustifiable physical pain or mental suffering, permitted or allowed the abuse or neglect that resulted in Jason's death, and committed an act that led to Jason's death. We review the evidence in the light most favorable to the prosecution and determine whether a "rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Mitchell v. State*, 124 Nev. 807, 816, 192 P.3d 721, 727 (2008). Here, the jury heard testimony that revealed a pattern of child abuse and neglect. Rimer placed his children in harm's way by subjecting them to deplorable living conditions, dispensing excessive corporal punishment, and concealing their unsafe and unhealthy environment from CPS. Rimer failed to provide adequate care and supervision for his

special-needs child, Jason, who required constant attention and yet was often left filthy, in need of clean diapers, and suffering from an unhealthy G-tube site. And, Rimer withdrew to his bedroom and failed to check on the condition and whereabouts of his special-needs child during the 17-hour period that preceded the discovery of the child's body. We conclude that sufficient evidence supports Rimer's convictions for child abuse and neglect and involuntary manslaughter. *See* NRS 200.070; NRS 200.508. It is for the jury to determine the weight and credibility to give conflicting testimony, and the jury's verdict will not be disturbed on appeal where, as here, substantial evidence supports its verdict. *See Bolden v. State*, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981).

B. *Sufficiency of the indictment*

Rimer claims that the indictment failed to articulate cognizable offenses of second-degree murder and child abuse and neglect resulting in substantial bodily harm, failed to give sufficient notice of the charges that he had to defend against at trial, and contained inflammatory surplusage because it described Jason as a "baby." We review constitutional challenges to the sufficiency of an indictment de novo. *West v. State*, 119 Nev. 410, 419, 75 P.3d 808, 814 (2003). Here, the indictment made reference to the statutes under which Rimer was charged; alleged the time, place, and method or manner in which the offenses were committed, and advised Rimer of what he needed to know to prepare his defense. We conclude that the indictment satisfies the constitutional and statutory notice requirements, *see* U.S. Const. amend. VI; Nev. Const. art. 1, § 8; NRS 173.075(1); *Jennings v. State*, 116 Nev. 488, 490, 998 P.2d 557, 559 (2000), and, further, that the district court did not abuse its discretion by ruling that the term "baby" was not surplusage, *see* NRS 173.085.

## C. *Constitutionality of NRS 200.508*

Rimer claims that NRS 200.508 is unconstitutionally vague because no reasonable person would understand the prohibition on child abuse and neglect to include leaving a child in the care of his or her mother or criminalizing foul odors, cluttered houses, dirty aquariums, low food supplies, sending children to bed without supper, calling children nonprofane names, spanking children, or failing to expediently eradicate a lice problem. "We review the constitutionality of a statute de novo, presuming that a statute is constitutional." *Clancy v. State*, 129 Nev., Adv. Op. 89, 313 P.3d 226, 231 (2013). Nevada's child-abuse-and-neglect statute plainly authorizes criminal penalties for an adult who either willfully or passively places a child "in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect," NRS 200.508(1), (2), and adequately defines its terms so that a person of ordinary intelligence would have notice of the prohibited conduct. *Smith v. State*, 112 Nev. 1269, 1276, 927 P.2d 14, 18 (1996), *abrogated on other grounds by City of Las Vegas v. Eighth Judicial Dist. Court*, 118 Nev. 859, 862-63, 59 P.3d 477, 480 (2002), *abrogated on other grounds by State v. Castaneda*, 126 Nev. 478, 482 n.1, 245 P.3d 550, 553 n.1 (2010). Consequently, we conclude that Rimer has failed to make a clear showing that the statute is unconstitutional as applied to him or otherwise overcome the statute's presumed constitutionality. *See Clancy*, 129 Nev., Adv. Op. 89, 313 P.3d at 231 (setting forth the test for unconstitutional vagueness).

## D. *Joinder of codefendant*

Rimer claims that the district court's failure to sever the joint trial deprived him of a fair trial because Colleen's inculpatory statement to police detectives was admitted into evidence, he and Colleen had mutually

exclusive defenses, and the nature of their defenses gave rise to an inference that they were both guilty. We review a district court's determination of whether to sever a joint trial for abuse of discretion. *Chartier v. State*, 124 Nev. 760, 763-64, 191 P.3d 1182, 1184-85 (2008). A joint trial must be severed "'if there is a serious risk that [it] would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *Marshall v. State*, 118 Nev. 642, 647, 56 P.3d 376, 379 (2002) (quoting *Zafiro*, 506 U.S. at 539). Here, Rimer informed the district court that there were no *Bruton*-type problems, *see Bruton v. United States*, 391 U.S. 123, 126 (1968) (holding that a defendant's constitutional right to confront his accusers is violated when a nontestifying codefendant's statement incriminates him and is used at their joint trial), and the district court determined that Rimer's defense—that he was sick in bed and relinquished all parenting responsibilities to Colleen—and Colleen's defense—that she had myotonic dystrophy and relied on others in the household to care for Jason—were not so inconsistent or inherently prejudicial that they require severance, *see generally Marshall*, 118 Nev. 644-48, 56 P.3d 377-80 (discussing inconsistent defenses). We conclude that the district court did not abuse its discretion in this regard.

### E. *Counsel of choice*

Rimer claims that the district court interfered with his constitutional right to counsel of his choice by denying his motion for a continuance. Although the Sixth Amendment right to counsel includes the right to retain counsel of one's own choosing, this right is not absolute. *United States v. Gonzales-Lopez*, 548 U.S. 140, 144 (2006). For example, "the denial of a continuance may infringe upon the defendant's right to counsel of choice, '[but] only an unreasoning and arbitrary insistence upon

expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel.'" *United States v. Carrera*, 259 F.3d 818, 825 (7th Cir. 2001) (citation omitted) (quoting *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)). Here, Rimer informed the district court on the eve of trial that he was substituting his court-appointed counsel with private counsel. He explained that private counsel had a different strategy and asked for a 90-day continuance. The district court denied the continuance because the case was old and had been pending since 2008, a firm trial date that fit everyone's schedules was set on November 4, 2010, and Rimer had known since November that his case would go to trial on February 14, 2011. We conclude that the district court did not abuse its discretion in this regard. *See United States v. Garrett*, 179 F.3d 1143, 1144-45 (9th Cir. 1999) (reviewing a district court's decision to deny a continuance that implicated defendant's right to counsel of choice for abuse of discretion).

F. *Peremptory challenge*

Rimer claims that the district court erred by overruling his objection to the prosecutor's use of a peremptory challenge. "An equal-protection challenge to the exercise of a peremptory challenge is evaluated using the three-step analysis adopted . . . in *Batson* [*v. Kentucky*, 476 U.S. 79 (1986)]." *Nunnery v. State*, 127 Nev., Adv. Op. 69, 263 P.3d 235, 257-58 (2011). The *Batson* analysis requires that the opponent of the peremptory challenge make a prima facie case of discrimination (first step) *before* the proponent of the challenge must assert a neutral explanation for the challenge (second step). *Purkett v. Elem*, 514 U.S. 765, 767 (1995). "[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005); *see also Watson v. State*, 130 Nev., Adv. Op. 76, 335 P.3d 157, 166-

SUPREME COURT
OF
NEVAOA

(O) 1947A

67 (2014) (discussing *Batson*'s first step). Rimer lodged his *Batson* challenge on the record after jury selection was settled off the record. Rimer challenged the prosecutor's decision to strike an African-American woman because "there was such limited contact during the jury selection, [and] so few questions asked of her." The prosecutor expressly declined to give reasons for his peremptory challenge until the district court determined whether a prima facie case of discrimination had been made. The district court found that one of the two African Americans in the venire had been seated on the jury, there was no showing that the prosecutor systematically excluded anybody, the challenged veniremember had in fact been questioned, and she had made statements that provided a sufficient reason for excluding her from the jury panel. This record supports our conclusion that Rimer's challenge was decided and denied at the first step of the *Batson* analysis. We see no clear error in that decision. *See Watson*, 130 Nev., Adv. Op. 76, 335 P.3d at 165 (observing that appellate court will not reverse district court's decision as to discriminatory intent unless it is clearly erroneous).

### G. *Evidentiary rulings*

Rimer claims that the district court made several erroneous evidentiary rulings. He preserved two of these alleged errors for appellate review. *See* NRS 47.040(1). "We review a district court's decision to admit or exclude evidence for an abuse of discretion." *Mclellan v. State*, 124 Nev. 263, 267, 182 P.3d 106, 109 (2008).

Rimer claims that the district court erred by refusing to admit statements that Colleen made against her penal interests because they supported his defense. "[Although] the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense," *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotations omitted),

Supreme Court
OF
Nevada

(O) 1947A

24

defendants must comply with established evidentiary rules "designed to assure both fairness and reliability in the ascertainment of guilt and innocence," *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). "[T]he statutory test for determining the admissibility of statements against penal interest under NRS 51.345 is whether the totality of the circumstances indicates the trustworthiness of the statement or corroborates the notion that the statement was not fabricated to exculpate the defendant." *Walker v. State*, 116 Nev. 670, 676, 6 P.3d 477, 480 (2000). Here, the district court found that Colleen's statements were not made under circumstances that dispelled the notion that they were fabricated, and Rimer has not demonstrated an abuse of discretion in this regard.

Rimer also claims that the district court erred by refusing to admit church records into evidence because they were records of a regularly conducted activity.[3] Reports maintained "in the course of a regularly conducted activity, as shown by the testimony or affidavit of the custodian *or other qualified person*, [are] not inadmissible under the hearsay rule unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." NRS 51.135 (emphasis added). The term "qualified person" is broadly interpreted and the proponent of the record need only make a prima facie

---

[3]To the extent that Rimer claims that the church records were admissible under NRS 51.185 (records of religious organizations), he did not argue this hearsay exception in the court below and we decline to consider it on appeal. *See Davis v. State*, 107 Nev. 600, 606, 817 P.2d 1169, 1173 (1991) (holding that this court need not consider arguments raised on appeal that were not presented to the district court in the first instance), *overruled on other grounds by Means v. State*, 120 Nev. 1001, 1012-13, 103 P.3d 25, 33 (2004).

showing of its authenticity so that a reasonable juror could find that the record is what it purports to be. *Thomas v. State*, 114 Nev. 1127, 1148, 967 P.2d 1111, 1124 (1998). Here, a ward bishop testified that he had no personal knowledge of whether the proffered record was an accurate copy of the records kept by the church. The district court reasonably concluded from this testimony that Rimer failed to make a prima facie showing of authenticity. Rimer has not demonstrated an abuse of discretion in this regard.

### H. *Negative inference argument*

Rimer claims that the district court erred by refusing to allow him to argue that the jury could draw negative inferences from the State's failure to call Spencer and Enoch as witnesses, present evidence regarding the contents of the second refrigerator and freezer on the first floor, and present evidence regarding the chemical containers that allegedly endangered the Rimer children. A defense attorney is permitted to argue all reasonable inferences that arise from the evidence presented at trial, including negative inferences that may arise when the State fails to call important witnesses or present relevant evidence and has some special ability to produce such witnesses or evidence. *Glover v. Eighth Judicial Dist. Court*, 125 Nev. 691, 705, 220 P.3d 684, 694 (2009). However, prosecutors and defense attorneys may not premise their arguments on facts that have not been admitted into evidence. *Id.* Here, the State decided not to call Spencer and Enoch as witnesses, and defense counsel decided not to hold the children over the weekend and call them to testify during the following week. The district court ruled that Rimer could argue that the State had the ability to call Spencer and Enoch as witnesses and its decision not to call them as witnesses is something that the jury should consider when evaluating whether there is sufficient

evidence to sustain guilty verdicts. The district court further ruled that Rimer could not comment on the evidentiary value of evidence that was not admitted into evidence. We conclude that the district court did not abuse its discretion in this regard.

## I. *Proposed jury instruction*

Rimer claims that the district court erred by rejecting his proposed instruction on the statute of limitations as it pertained to child-abuse-and-neglect counts 3 through 7. Rimer asserts that the district court's rejection of this instruction and its refusal to require the jury to be unanimous as to the theory of conduct that it finds to be abusive or neglectful deprived him of the ability to present a statute-of-limitations defense. It appears that jury instructions were settled off the record and then the parties' objections and the rejected instructions were memorialized on the record. However, the record does not include the rejected defense instructions nor indicate why they were rejected. Without an adequate record, we are unable to resolve this claim on the merits. *See Thomas v. State*, 120 Nev. 37, 43 & n.4, 83 P.3d 818, 822 & n.4 (2004) ("Appellant has the ultimate responsibility to provide this court with 'portions of the record essential to determination of issues raised in appellant's appeal.'" (quoting NRAP 30(b)(3))); *Greene v. State*, 96 Nev. 555, 558, 612 P.2d 686, 688 (1980) ("The burden to make a proper appellate record rests on appellant.").

## J. *Prosecutorial misconduct*

Rimer claims that the prosecutor committed various acts of misconduct throughout the trial. He preserved four of these claims for appeal. We analyze claims of prosecutorial misconduct in two steps: first, we determine whether the prosecutor's conduct was improper, and second, if the conduct was improper, we determine whether it warrants reversal.

*Valdez v. State*, 124 Nev. 1172, 1188, 196 P.3d 465, 476 (2008). "[We] will not reverse a conviction based on prosecutorial misconduct if it was harmless error." *Id.*

First, Rimer claims that the prosecutor committed misconduct by characterizing spankings as beatings. However, any harm arising from the prosecutor's use of the term "beatings" during his examination of the witnesses was cured when the district court sustained Rimer's objections, and the prosecutor did not commit misconduct by using the term during closing argument because he was free to argue facts or inferences supported by the evidence and to offer conclusions on disputed issues during closing argument. *See Miller v. State*, 121 Nev. 92, 100, 110 P.3d 53, 59 (2005).

Second, Rimer claims that the prosecutor committed misconduct by eliciting testimony that a CPS investigator went to the Rimer home in response to a complaint involving Crystal. The record reveals that the district court determined that nothing was said that would lead the jury to believe that there was a bad act involving Crystal, cautioned the prosecutor to avoid situations involving other bad acts, and overruled Rimer's objection. Nothing in the record suggests that the prosecutor's conduct was improper in this regard.

Third, Rimer claims that the prosecutor committed misconduct by conveying facts not in evidence through a hypothetical question posed to a defense expert. Dr. Carl Dezenberg testified that he did not have any concerns about the care that Jason was receiving from his family. In an attempt to undermine Dr. Dezenberg's testimony, the prosecutor asked,

> Would it have caused you concern if you had learned that on the day that Jason was presented

SUPREME COURT
OF
NEVADA

(O) 1947A

> to have his G-tube removed by Dr. Reyna that Dr.
> Reyna refused to do surgery because Jason was so
> dirty he needed to have him bathed before [he]
> was willing to perform the surgery?

The district court allowed the question after determining that it was being posed as a hypothetical question. The prosecutor's question did not constitute misconduct because opposing parties are allowed to explore and challenge the basis of an expert witness's opinion. *See* NRS 50.285(2) (an expert may base his opinion on facts and data that are not admissible in evidence); *Blake v. State*, 121 Nev. 779, 790, 121 P.3d 567, 574 (2005) ("It is a fundamental principle in our jurisprudence to allow an opposing party to explore and challenge through cross-examination the basis of an expert witness's opinion."); *Anderson v. Berrum*, 36 Nev. 463, 469, 136 P. 973, 976 (1913) ("On cross-examination it is competent to call out anything to modify or rebut the conclusion or inference resulting from the facts stated by the witness on his direct examination.").

Fourth, Rimer claims that the prosecutor committed misconduct by arguing that the defense failed to prove that the Rimers were sick on the day of Jason's death. During the opening statements, both Rimer and Colleen claimed that the evidence would show that they were sick and spent most of the day in bed. The prosecutor acknowledged these statements during closing argument and asked, "what evidence is there to suggest that they were sick. How about a witness." This argument was not misconduct because the prosecutor was merely pointing out "that the defense failed to substantiate its theory with supporting evidence." *Evans v. State*, 117 Nev. 609, 631, 28 P.3d 498, 513 (2001); *see Leonard v. State*, 117 Nev. 53, 81, 17 P.3d 397, 415 (2001).

### K. *Felony adjudication*

Rimer argues that the district court erred by adjudicating him guilty of felony child abuse and neglect as to counts 3 through 7 because the State failed to request a special verdict form so that the jurors could designate the theories of liability they found beyond a reasonable doubt, the Department of Parole and Probation treated the counts as gross misdemeanors, and defense counsel asked the district court to adjudicate the counts as gross misdemeanors. However, the plain language of the amended indictment demonstrates that Rimer was accused of committing a felony under NRS 200.508(1) because it states that he committed the child abuse and neglect by *causing* a child to suffer harm or by *placing* a child in a situation where he may have suffered harm. *See Ramirez v. State*, 126 Nev. 203, 208-09, 235 P.3d 619, 623 (2010) (explaining the difference between the criminal offenses described in NRS 200.508 subsections (1) and (2)). Rimer was not accused of committing child abuse and neglect under NRS 200.508(2), the jury was properly instructed on counts 3 through 7, and the jury found Rimer guilty of each of these counts. Accordingly, the district court did not abuse its discretion by adjudicating Rimer guilty of felony child abuse and neglect. *See Chavez v. State*, 125 Nev. 328, 348, 213 P.3d 476, 490 (2009) (reviewing a district court's sentencing decision for abuse of discretion).

### L. *Double jeopardy*

Rimer argues that his involuntary-manslaughter and child-abuse-and-neglect-resulting-in-substantial-bodily-harm convictions violate the Double Jeopardy Clause and are redundant because they punish the exact same act—Jason's death. However, each of these offenses requires proof of an element that the other does not: involuntary manslaughter requires proof of a homicide, *see* NRS 200.070, and child abuse and neglect

requires proof of an intentional act that either causes or allows a child to suffer harm or be placed in a situation where he or she may suffer harm, *see* NRS 200.508(1), (2). Accordingly, Rimer's convictions do not violate the Double Jeopardy Clause's prohibition against multiple punishments for the same offense, *see Blockburger v. United States*, 284 U.S. 299, 304 (1932) (establishing an elements test for determining whether separate offenses exist for double jeopardy purposes), and they are not redundant because neither statute indicates that cumulative punishment is precluded, *see Jackson v. State*, 128 Nev., Adv. Op. 55, 291 P.3d 1274, 1282 (2012) (applying the *Blockburger* test to redundancy claims when the relevant statutes do not expressly authorize or prohibit cumulative punishment).

M. *Plain error review*

Many of Rimer's claims of error were not preserved for appellate review. He either failed to object and state the specific grounds for his objection during trial, or the grounds that he now urges on appeal are different from those he presented below. *See Thomas v. Hardwick*, 126 Nev. 142, 155-57, 231 P.3d 1111, 1120-21 (2010) (discussing unpreserved challenges to the admission of evidence); *Valdez v. State*, 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008) (discussing unpreserved challenges to prosecutorial conduct); *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003) (discussing unpreserved challenges to jury instructions). Nonetheless, we have discretion to review for plain error. *See* NRS 178.602; *Gallego v. State*, 117 Nev. 348, 365, 23 P.3d 227, 239 (2001), *abrogated on other grounds by Nunnery v. State*, 127 Nev., Adv. Op. 69, 263 P.3d 235, 253 & n.12 (2011). "An error is plain if the error is so unmistakable that it reveals itself by a casual inspection of the record. At a minimum, the error must be clear under current law, and, normally,

the defendant must show that an error was prejudicial in order to establish that it affected substantial rights." *Saletta v. State*, 127 Nev., Adv. Op. 34, 254 P.3d 111, 114 (2011) (citations omitted) (internal quotations omitted).

Rimer claims that the district court erred by allowing portions of the grand jury transcript to be read into the record and admitting evidence of other bad acts, evidence of purported misconduct that occurred outside the time frame alleged in the indictment, the opinion testimony of lay witnesses, and photographs that were prejudicial and cumulative. Rimer also claims that the district court improperly instructed the jury on child endangerment, the definition of the statutory term "permit," the presumption of innocence, and the unanimous verdict requirement. And Rimer further claims that the prosecutor committed misconduct by inviting references to Rimer's custodial status, eliciting testimony that a crime scene investigator was treated for scabies, arguing facts not in evidence, arguing that the State did not need to prove each allegation as to each named victim, arguing that Rimer had no choice but to speak to authorities after Jason's death, and exhorting the jurors not to let the system fail Jason again.

We have carefully reviewed each of these claims and, to the limited extent that there was error, we conclude that the error did not affect Rimer's substantial rights and therefore he has not demonstrated plain error. *See United States v. Olano*, 507 U.S. 725, 734 (1993) (An error that affects the substantial rights of a defendant is one that "affected the outcome of the district court proceedings.").

N. *Cumulative error*

Rimer claims that cumulative error requires reversal of his convictions. However, because Rimer has failed to demonstrate any trial

error, we conclude that he was not deprived of a fair trial due to cumulative error.

## CONCLUSION

Having determined that the district court did not err by concluding that child abuse and neglect is a continuing offense for purposes of the statute of limitations, that the criminal counts were properly joined because they evinced a pattern of abuse and neglect that would have been relevant and admissible in separate trials for each charge, and that none of the remaining claims warrant relief, we affirm Rimer's judgment of conviction.

_____, J.
Douglas

We concur:

_____, C.J.
Hardesty

_____, J.
Parraguirre

_____, J.
Pickering

CHERRY, J., with whom SAITTA, J., agrees, dissenting:

While the majority characterizes the procedural and prosecutorial errors during Rimer's trial as innocuous, the cumulative effect of these errors warrants reversal. Rimer's trial was unfairly prejudiced from the outset due to the misjoinder of counts and trials. The district court failed to take the most basic precautions of a limiting instruction or a *Petrocelli* hearing. Moreover, because the State decided to prosecute Rimer for child abuse or neglect under the continuing offense doctrine, Rimer's rights under the Double Jeopardy Clause, *see* U.S. Const. amend. V, were violated when he was twice convicted for abuse and neglect of four-year-old Jason. Therefore, I dissent.

*Continuing offense doctrine*

Even assuming that child abuse or neglect is a continuing offense and therefore extends the statute of limitations in the instant case, I would nonetheless reverse one of the charges against Rimer for acts of abuse and neglect against Jason. If child abuse or neglect is a continuing offense, then both charges against Rimer for abusing and neglecting Jason cannot stand.

The Double Jeopardy Clause "protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (footnote omitted). Other appellate courts have held that continuing offenses are, by definition, single offenses, even though comprised of multiple, discrete acts. *State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000) ("In cases when the nature of the charged offense is meant to punish a continuing course of conduct, . . . election of offenses is not required because the offense is, by definition, a *single offense*."

(emphasis added)); *see also People v. Ewing*, 140 Cal. Rptr. 299, 301 (Ct. App. 1977) (holding that "[a]lthough the child abuse statute may be violated by a single act, more commonly it covers repetitive or continuous conduct" (citation omitted)); *People v. Hogle*, 848 N.Y.S.2d 868, 871 (N.Y. Crim. Ct. 2007) (holding that "[e]ndangering the welfare of a child may be characterized as a continuing offense over a period of time 'made up of a continuity of acts or of omissions, neither of which may be enough by itself, but each of which comes in with all the rest to do the harm and make the offense'" (citation omitted) (quoting *Cowley v. People*, 83 N.Y. 464, 472 (N.Y. 1881))). Here, Rimer was convicted of two counts of abusing or neglecting Jason under a single course of conduct. Rimer's acts and omissions of abuse or neglect that led to Jason's death are therefore included within the same course of conduct as those of failing to provide the proper care necessary for Jason's well being. Because it is all part of a single course of conduct, only one conviction is permitted.

Because a course of conduct is a "single offense," *see Adams*, 24 S.W.3d at 294, Rimer cannot be punished twice for a single course of conduct. I would therefore reverse the redundant conviction for child abuse or neglect of Jason.

*Misjoinder of charges and codefendant's trial*

Under NRS 173.115, NRS 48.045(2), and the admissibility standards delineated in *Tinch v. State*, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997), evidence of Rimer's abuse of Jason's older siblings unfairly prejudiced Rimer. Accordingly, the district court should have severed the abuse counts from those pertaining to Jason's death. Evidence that Rimer abused the older children is not cross-admissible because it lacks relevancy to Jason's death. Such evidence only "show[s] an accused's

criminal character and the probability that he committed the crime." *Shults v. State*, 96 Nev. 742, 748, 616 P.2d 388, 392 (1980).

Rimer's alleged abuse of his other children cannot be linked to Rimer's failure to inquire into Jason's whereabouts on the day of Jason's death. NRS 48.045(2). A parent's motive to inflict physical abuse on his or her child is not remotely similar to a parent's motive to neglect his or her child's whereabouts—especially when, as here, the evidence shows that the parent believes that others are caring for the child.

Similarly, evidence that Rimer abused his older children does not demonstrate "absence of mistake or accident" for the charges involving Jason's death. *Id.* Not only does the evidence of abuse pertain to other alleged victims, the acts that the majority believes to be related—corporal punishment and ignoring a child's whereabouts—are clearly distinct. They cannot possibly constitute part of a single series of events. Evidence "that a child has experienced injuries in many purported accidents is evidence that the most recent injury may not have resulted from yet another accident." *Bludsworth v. State*, 98 Nev. 289, 292, 646 P.2d 558, 559 (1982). However, instances of *intentional* acts against older children lack relevance when the youngest child was the subject of an unintentional accident.

Evidence of additional abuse beyond Rimer's alleged abuse of Jason unfairly portrayed Rimer as a "bad father." Allowing this evidence implied that he was an abusive father, in general, by suggesting that he was prone to do that which "bad fathers" may do. Even if evidence for the counts of the older children's physical abuse might have some probative value for the charges pertaining to Jason's death, joinder of these counts terminally infected the proceedings with "the danger of unfair prejudice."

The substantial and injurious effect of the evidence should have compelled the trial judge to exercise his discretion to sever the charges. *Tinch*, 113 Nev. at 1176, 946 P.2d at 1064-65; *see Tabish v. State*, 119 Nev. 293, 304, 72 P.3d 584, 591 (2003); *Bludsworth*, 98 Nev. at 292, 646 P.2d at 559.

The inappropriate joinder of Rimer's and Colleen's trials is of equal and weighty concern. These defendants had antagonistic, irreconcilable, and mutually exclusive defenses. *See Marshall v. State*, 118 Nev. 642, 645-46, 56 P.3d 376, 378 (2002); *Rowland v. State*, 118 Nev. 31, 45, 39 P.3d 114, 122-23 (2002). Rimer's defense (that he relied on Colleen to take care of Jason) directly contradicts Colleen's defense (that, because she suffered from adult-onset myotonic dystrophy, she relied on others to care for Jason). While Colleen's defense diffused her individual responsibility among other members of the household, Rimer's defense turned on Colleen's role as Jason's caretaker. Thus, if the jury accepted Colleen's defense, it would inevitably reject Rimer's defense.

This misjoinder compromised Rimer's right to a fair trial. *See Marshall*, 118 Nev. at 646, 56 P.3d at 379 (stating that joinder is "prefer[able] as long as it does not compromise a defendant's right to a fair trial"). The joinder also unfairly prejudiced Rimer because the jury could not reasonably be expected to "compartmentalize the evidence as it relate[d] to separate defendants." *Lisle v. State*, 113 Nev. 679, 689, 941 P.2d 459, 466 (1997) (internal quotation omitted), *overruled on other grounds by Middleton v. State*, 114 Nev. 1089, 1117 n.9, 968 P.2d 296, 315 n.9 (1998). In a decision requiring such a delicate determination as whether a defendant's negligence is criminal and requires conviction, the distortion of a jury's ability to evaluate guilt or innocence demands reversal. *See, e.g., Tabish*, 119 Nev. at 305, 72 P.3d at 591 ("[P]rejudice

SUPREME COURT
OF
NEVADA

(O) 1947A

created by . . . failure to sever the charges is more likely to warrant reversal in a close case.").

*Omission of a limiting instruction to the jury*

Next we consider the omission of a limiting instruction for the prior bad acts evidence admitted against Rimer. *See Mclellan v. State*, 124 Nev. 263, 269, 182 P.3d 106, 110-11 (2008) (holding that admission of prior bad acts evidence requires a limiting instruction, unless waived by the defendant prior to admission). Both the State and the district court share blame for this error. *See id.* After the district court admitted such evidence, the prosecutors ignored their duty "to request that the jury be instructed on the limited use of prior bad act evidence." *See id.* More importantly, the district court failed to heed this court's direction and "raise the issue *sua sponte*" after the State neglected its duty to do so. *See id.*

This court has recognized that "[w]hen . . . potential prejudice is present, it can usually be adequately addressed by a limiting instruction to the jury." *Tabish*, 119 Nev. at 304, 72 P.3d at 591. Particularly in the face of imminent unfair prejudice, the district court should have taken appropriate steps to properly instruct the jury. Though this procedural safeguard would not have been adequate to ameliorate the unfair prejudice arising from joinder of counts and trials, the court nonetheless should have taken steps to inhibit any possible prejudice resulting from joinder. *See id.* (holding that, given the graphic nature of the evidence, a limiting instruction was insufficient "to mitigate the prejudicial impact of the joinder on the jury's consideration of appellants' guilt on the remaining counts"). Not doing so is an additional ground for reversal.

*Prosecutorial misconduct*

Three statements made by the prosecutor constitute egregiously improper conduct. First is the State's use of the term "beat" in reference to corporal punishment. This was an impermissible mischaracterization of the testimony. *See Valdez v. State*, 124 Nev. 1172, 1188, 196 P.3d 465, 476 (2008). The district court acknowledged the prosecution's mischaracterization and sustained objections to the use of "beat." The court additionally instructed the prosecution to use the word "discipline" instead of the word "beat." Regardless, the prosecutor continued to use the word "beat" and refused to alter his vocabulary despite the court's instructions. This is blatant misconduct.

Second, the prosecution committed misconduct by suggesting facts not in evidence when it posed hypothetical questions involving Jason's G-tube. Though the prosecutor correctly stated that NRS 50.285(2) permits the use of hypothetical questions, such questions cannot contain facts that are not supported by the evidence. *See Wallace v. State*, 84 Nev. 603, 606, 447 P.2d 30, 32 (1968). This is also misconduct.

Finally, the prosecutor's argument that the defense failed to present witnesses establishing that Rimer was ill on the day that Jason died impermissibly shifted the burden of proof. This court has determined that it is generally improper to comment on the defense's failure to call witnesses or produce evidence, yet this is exactly what the prosecutor did. *See Whitney v. State*, 112 Nev. 499, 502, 915 P.2d 881, 883 (1996). This, too, constitutes misconduct.

*Plain errors*

Several instances of unobjected-to procedural errors are equally troublesome. First, the district court should have sua sponte

ordered a *Petrocelli* hearing for the unobjected-to prior bad acts, namely that Rimer threatened CPS, paid or asked his children not to speak to CPS, and allegedly hit his daughter. Without a *Petrocelli* hearing to determine whether (1) the evidence is relevant, (2) the prior bad act "is proven by clear and convincing evidence," and (3) the danger of unfair prejudice substantially outweighs the evidence's probative value, *Tinch*, 113 Nev. at 1176, 946 P.2d at 1064-65, "this court [has] be[en] deprived of the opportunity for meaningful review of the trial court's admissibility determination." *Qualls v. State*, 114 Nev. 900, 903, 961 P.2d 765, 766-67 (1998).

Under plain error review, the failure to conduct a *Petrocelli* hearing and the prosecutorial misconduct warrant reversal. We note, that reversal is not always necessary when a district court fails to hold a *Petrocelli* hearing. *McNelton v. State*, 115 Nev. 396, 405, 990 P.2d 1263, 1269 (1999). However, the district court's failure here compels reversal as "(1) the record is [not] sufficient to determine that the [prior bad act] evidence is admissible under *Tinch*; [and] (2) the result would [not] have been the same if the trial court had not admitted the evidence." *Id.* Evidence of threats to CPS and allegedly asking his children not to speak to CPS solely served as character evidence by framing Rimer as a bad person. Rimer's actions and frustrations toward an agency interested in protecting children does not automatically indicate that he did not properly protect his children. Because the evidence bears no relevance to the issue of whether he committed acts of abuse, neglect, or homicide, the evidence is inadmissible under the first *Tinch* standard. *See* 113 Nev. at 1176, 946 P.2d at 1064-65 (holding that the prior bad act evidence must,

first, be relevant to be admissible). Next, even assuming relevance, the prejudicial effect of the evidence far outweighs its probative value. *See id.*

Two additional unobjected-to prosecutorial statements are erroneous, as the record did not support the assertions. *See Guy v. State*, 108 Nev. 770, 780, 839 P.2d 578, 585 (1992). First, the prosecutor's statement that the house was a "house of horrors" is neither substantiated by the evidence nor a permissible inference. Second, the State's claim that the system failed Jason and its exhortation that the jury prevent this from occurring again is severely inflammatory. This court has held that "[t]here should be no suggestion that a jury has a *duty* to decide one way or the other; such an appeal is designed to stir passion and can only distract a jury from its actual duty: impartiality." *Evans v. State*, 117 Nev. 609, 633, 28 P.3d 498, 515 (2001) (emphasis added) (internal quotations omitted).

The unobjected-to prosecutorial misconduct warrants reversal because the error "'had a prejudicial impact on the verdict when viewed in context of the trial as a whole.'" *See Gaxiola v. State*, 121 Nev. 638, 654, 119 P.3d 1225, 1236 (2005) (quoting *Rowland*, 118 Nev. at 38, 39 P.3d at 118). Given the extremely inflammatory nature of those statements, "the misconduct is 'clearly demonstrated to be substantial and prejudicial.'" *Miller v. State*, 121 Nev. 92, 99, 110 P.3d 53, 58 (2005) (quoting *Sheriff v. Fullerton*, 112 Nev. 1084, 1098, 924 P.2d 702, 711 (1996)). The jury's return of a lesser offense of involuntary manslaughter may reflect that this misconduct was ineffective, however, the prosecutor's inappropriate statements may have compelled the jury to return some sort of guilty verdict.

*Cumulative error*

Under a cumulative error analysis, (1) the misjoinder of counts and trials, (2) the erroneous omission of a limiting instruction on prior bad acts evidence, and (3) the numerous instances of prosecutorial misconduct are grounds for reversal because of their "substantial and injurious effect or influence in determining the jury's verdict." *Tavares v. State*, 117 Nev. 725, 732, 30 P.3d 1128, 1132 (2001) (internal quotations omitted).

*Conclusion*

Given the breadth of the numerous, unfair, and dangerous prejudicial errors that impacted Rimer's trial, the conviction should have been reversed. Therefore, I dissent.

_____, J.
Cherry

I concur:

_____, J.
Saitta

GIBBONS, J., dissenting:

I dissent.

_____, J.
Gibbons

SUPREME COURT
OF
NEVADA

(O) 1947A